VOIGTMANN et al. v. WEIS & RIDGE CORNICE CO. et al.

(Circuit Court of Appeals, Eighth Circuit. October 30, 1906.)

No. 2,235.

1. PATENTS—INVENTION.
    It is not invention to merely extend the use of an old combination of elements, where no new result is produced and no new method of producing the old result.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 15, 41.]

2. SAME.
    The utility, public acceptance, or magnitude of sales of a patented article can only be considered on the question of invention, when such question is otherwise doubtful.

3. SAME—FIREPROOF WINDOWS.
    The Voightmann patent, No. 600,186, for an automatically closing fireproof window, covers a combination of old elements previously used, in some instances in the same combination, for analogous purposes, and is void for lack of patentable invention.

Appeal from the Circuit Court of the United States for the Western District of Missouri.

For opinion below, see 133 Fed. 298.

Albert H. Graves and Charles K. Offield (Charles C. Linthicum, on the brief), for appellants.

John G. Elliott, for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. This was a bill to enjoin the infringement of United States patent No. 600,186, granted complainant and appellant Voigtmann, March 8, 1898, for "a new and useful improvement in fireproof windows." The fifth, sixth, and seventh claims of the patent, alleged to have been infringed by defendants and appellees, are as follows:

"5. In a fireproof window, the herein described automatically closing sash, consisting of the combination of the fireproof casing, A, the fireproof sash, L, pivoted therein, the destructible retaining device, M, N, by which said sash is held open; all substantially as shown and described.

"6. In a fireproof window, the herein described automatically closing sash, consisting of the combination of the fireproof casing, A, the fireproof sash, L, pivoted therein, the retaining chain, M, having the fusible link, N, therein; all substantially as shown and described.

"7. In a fireproof window, the herein described automatically closing sash, consisting of the combination of the fireproof casing, A, the fireproof sash, L, pivoted therein at a pivot, P, above its middle, the retaining chain, M, having the fusible link, N, therein at a point opposite the opening; all substantially as shown and described."

The object of the invention involved in these claims, as described in the specification, is, generally speaking, to provide a fire proof window which would not be seriously injured by a fire and which would close automatically when struck by heat. The invention itself is described in the specification as follows:

"It consists, broadly, of a window having a sheet-metal casing with clenched joints at its corners and elsewhere, which require no solder, and a fireproof

glass set into the sash with metallic fastenings; one of the sash being hinged and held open by a retaining device which will be severed by the heat of a fire."

In describing the construction, principle, and use of the invention, and the best mode of applying the principle, the patentee says:

"The panes of glass are preferably of what is known as 'wire glass,' glass having a wire mesh running through it which makes it indestructible by ordinary fire; but other glass or different material may, of course, be used if capable of resisting heat. * * * The fusible link," in the language of the description, is "preferably made of two strips of metal soldered together by some fusible alloy, which melts on exposure to unusual heat and allows the parts to drop apart; but in place of this link any other destructible connection, which is inflammable or readily destroyed by heat or fire, may be used."

From the claims as elucidated by the description it is apparent that the invention of the patent was intended to broadly cover any fireproof window, made either of wire glass or any other indestructible material, in a metallic sash, with lugs adapted to turn down and secure the glass thereto, inclosed in a metallic case having its joints at the four corners clenched, preferably riveted together, with the sash pivoted to the casing above its middle, and held open by a chain attached to its upper edge, and made fast to a hook below; a fusible link or other easily destructible substance being inserted in the retaining chain, to the end that, when a fire occurs without or within a building, the destructible link will be quickly burned or disintegrated by the heat, the retaining chain lose its hold on the tilted window, and the part below the pivots, being heavier than the upper part, drop into a closed position by gravity, thereby preventing the spread of fire from without into the building, or from within to other buildings on the outside.

Wire glass, which the inventor preferably employed, was a well-known article of commerce, and had been used for purposes similar to that of the invention in suit. For that reason, doubtless, it is not specified as necessarily to be included as an element of either of the claims of the patent. This the experts for both sides concede. The metallic sash and casing, with lugs, and clutched or riveted joints, the pivoting of the sash into the casing above its center of gravity, the chain attached to the upper edge and fastened below with the intervening fusible or other combustible link, were all old and well recognized before the invention of the patent. They, in one form or another, had been the subjects of patent grants and had been employed in divers forms of mechanical constructions. Not to mention other patents, those to Frank Shuman, numbered 483,020, dated September 20, 1892, and to Edward Walsh, Jr., numbered 533,512, dated February 5, 1895, clearly show the process of manufacturing wire glass, and the proof abundantly shows its utility and actual use as a fire retardant some time before the invention of the patent in suit. The fusible link was also old in a variety of structures as a device for holding and releasing a cord or chain, permitting automatic closing of windows or other shutters. This is exemplified, among other patents not necessary to mention, in the Ashcroft patent, numbered 386,620, dated July 24, 1888, for "useful improvement in safety covers for elevator wells, hatchways, and other roof openings," and in the Moody patent, No.

563,394, dated July 7, 1896, "for new and useful improvement in fusible joints."

The clinching or riveting of the joints of the cases, instead of soldering, and the fastening of the glass into the sash with lugs turned down over it, were neither of them new. Both had been the subject of patents. Without mentioning others, in the Kern patent, No. 431,025, dated June 24, 1890, for certain "new and useful improvements in fireproof window casings and frames," the specification contains the following:

"The parts of the casing are united to each other in any suitable manner, preferably by folding and riveting, as it is desired to dispense with the use of screws and bolts and to avoid all soldering. * * * The glass is held in place by tabs or spurs, which are integral with the sash frame, and are formed by cutting the metal so that they may be bent to permit the glass to be put in place, and then bent to confine the glass against the ribs.

In the Rowland patent, No. 443,796, dated December 30, 1890, "for a new and useful improvement in sash lifters, closers, and locks," is shown the pivoting of a sash in the form substantially as done by the patentee in this case, so as to automatically close when released from a fixed position.

The foregoing patents disclose the use of the different elements of complainants' patent in different devices, but no one of them employed all. It is left to applied art to show the latter. The record discloses the daily and public use of a device in Milwaukee long antedating the application for the patent in this case, which, in our opinion, shows all the elements, or their mechanical equivalents, of the invention in question. It was a skylight over the stage in the Pabst Theater. The top of it was composed of two metallic sashes, incasing glass five-eighths of an inch in thickness, pivoted at their lower horizontal edges to the top of the well, inclining upwardly and obliquely on either side, one overlapping the other at the point of meeting, resulting in the general appearance of a common gable roof. Both sashes were weighted by rods projecting outwardly from their juncture with the upper edge of the well, forming counter-weights, so as to tilt the sashes open when not subject to an opposite force. These sashes were normally held together at the apex by a cord attached to the overlapping one extending down to the stage floor and there made fast. Somewhere in this cord and near to the sash was interposed a fusible link. The purpose of that device was two-fold—one to ventilate the theater, and the other to afford a means, in case of fire on the stage, of furnishing a draft up through the skylight, and thereby to avoid spreading of the fire into the auditorium. The operation of the device for ventilating purposes was to unfasten the cords below, when the counterweights extending over the side of the well at the top would tilt up and open the sashes, and in case of fire, when the heat became sufficient to melt the fusible metal of the link or otherwise to destroy the cord, the same effect would be produced. The counterweights would tilt open the sashes on their pivots and open up the skylight for the fire to escape without spreading.

The stables of the Union Club in Elizabeth, N. J., as early as 1870 showed the use of skylights held closed by a rope, inserted in which was a fusible link intended to melt in case of fire and by melting to au-

tomatically open the skylights and thus make an exit for smoke and flame, so that they would not permeate the stables and prevent the removal of horses.

The Haeussler Warehouse in St. Louis, in our opinion, disclosed in 1892 all the elements and combination of elements shown in the patent in suit. It had two turret skylights, one of which had 20 and the other 26 upright windows, with sash of sheet metal holding glass three-eighths of an inch thick pivoted above its center into frames of sheet metal, having their joints lapped and riveted together. Each window was held open by a small cord about 12 feet long, secured to the upper edge of each sash, and extending down to the upper floor of the warehouse, and there fastened to a rail. These cords each extended downwardly, so as to pass the opening of the window when in operation. This St. Louis structure responds accurately to claim 5 of the patent. It had its sash, casing, pivoting, and the destructible retaining device by which the sash is held open; and by treating the small cord as the mechanical equivalent of the fusible chain and link of the patent, the St. Louis structure also responds accurately to claims 6 and 7 of the patent. The patentee did not limit his invention to the use of the fusible link, but only made it the preferable construction, claiming in his specification any destructible connection which is inflammable or readily destroyed by heat. The St. Louis structure did not employ the wire glass, but instead thereof plate glass three-eighths of an inch in thickness.

So much for the patents and the physical devices showing the state of the art at the time of the invention of the patent. But the proof discloses more than this. There is satisfactory oral evidence of the use of sashes prior to the invention of the patent with joints made by folding the edges of the metal and lapping and riveting them together, and of the actual use in fireproof windows of wire glass as a fire retardant.

The foregoing phases of the art were certainly "known or used by others in this country," within the meaning of section 4886, Rev. St. [U. S. Comp. St. 1901, p. 3382], before Voigtmann's supposed invention or discovery, and, whatever the fact may be, he is chargeable with a knowledge of all pre-existing patents and devices. Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 493, 20 Sup. Ct. 708, 44 L. Ed. 856. If they, or any of them, constitute his invention or the mechanical equivalent of it, his patent is void for want of novelty. If the combination of elements disclosed in the claims had not been employed in the limited sphere of making and operating fireproof windows, claimed to be the special scope of the invention of the patent, they certainly had been employed in the same or closely allied art. They, or their mechanical equivalents, referred to and recognized in the description as such, were known and in actual use in the Pabst Theater, in the stables of the Union Club at Elizabeth, N. J., and in the Haeussler Warehouse at St. Louis. Other structures and some of the patents offered in evidence to illustrate the prior art, as well as the uncontradicted testimony of George Hayes, a widely known inventor and a man of extensive experience in the department of fireproof windows, likewise

disclose the use of the elements of the patent or their equivalents in some form or other and for some purpose or other; but the three structures already referred to afford evidence so satisfactory that we refrain from further comment upon other patents, structures, or uses to which, if necessary, reference might be made.

From a consideration of these structures it appears that the device of the patent had been known and used by others before Voigtmann entered the field of invention for at least two purposes: First, to automatically permit the escape of interior fires and prevent their spreading; and, second, to provide an automatic efficient method of ventilation. What more did the patentee in this case do? His counsel earnestly urge that he originally conceived and secured a patent, broadly speaking, for a new art—the automatically closing fireproof window art. Admitting that he employed old elements, they contend that he produced a transparent, in place of the old opaque iron, fireproof shutter. This particular virtue is claimed to reside, among other things, in the use of wire-enmeshed glass. But this, or its use as a fire retardant, we have already seen, did not originate with Voigtmann. Neither did Voigtmann make it a necessary element of any of his claims. Moreover, the other elements of his claims, or their combination with the wire glass or other mechanical equivalents to produce the window of the patent, were old and well understood in the manufacture of devices to accomplish other similar purposes. We cannot, therefore, treat the window of the patent as an independent art, or disassociate it with the prior art already disclosed. There is no new combination of old elements in it. It is at best an analogous use of old elements or their equivalents combined as before. The old mechanism formerly used to let out fire when originating within a building for the purpose of preventing its spreading was employed by Voigtmann either to confine it when originating within a building or to prevent it from gaining access into a building when originating without. His main purpose was to so control a conflagration as to prevent destruction to property. The former art, it may be conceded, had for its main purpose to so control the conflagration as to prevent loss of human or animal life. Both relate to controlling the ravages of a conflagration and belong to a subject which had been much exploited, both theoretically and practically, before Voigtmann entered the field. His patent, therefore, should be strictly construed and a clear demonstration made of the exercise of inventive genius. Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275. Mr. Justice Brown, delivering the opinion of the court in that case, says:

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use."

Applying that test here, we cannot doubt that a skilled mechanic, with a full knowledge of the former art relating to the control of a fire originating within a building, including knowledge of the identical structure of the patent as disclosed in the Haeussler Warehouse, would readily perceive the advantage of applying the principles of that art

and structure to the control of a fire originating without a building. All he needed to discern was that the device found in the Pabst Theater, intended to hold the window normally closed, could be utilized to hold it normally open, or to discern that the elements and operation of the Haeussler device in St. Louis could be devoted to a new use. No patentable invention was involved in such discernment. It may readily be conceded that Voigtmann extended the use of an old combination of elements; but he produced no new result, or any improved method of producing the old result. He, at most, put an old and well-known combination of elements to a new use. "Carrying forward or more extended application of an original idea—a mere improvement in degree—is not invention." Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566; Burt v. Evory, 133 U. S. 349, 10 Sup. Ct. 394, 33 L. Ed. 647; Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267. It is not invention to discover that the principle of an ice cream freezer can be employed to preserve fish. Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200. It is not invention to take a coffee mill and patent it as a mill for grinding spices. Potts v. Creager, supra. It is not invention to use the process of an ordinary winnowing mill to separate the silver skin from ground coffee. Baker v. Duncombe Mfg. Co. (recently decided by this court), 146 Fed. 744, and many cases there cited. It is not invention to adapt to an ordinary windmill the combination of an internal toothed spur wheel with an external toothed pinion, for the purpose of converting a revolving into a reciprocating motion. Mast, Foos & Co. v. Stover Mfg. Co. All that Martin, the patentee in that case did, in the language of the Supreme Court (177 U. S. 493, 20 Sup. Ct. 708, 44 L. Ed. 856) was "to apply it [the combination] to a new purpose in a machine where it had not before been used for that purpose." This, we think, well expresses the true meaning of Voigtmann's effort.

We have not overlooked the importance attached by plaintiffs' counsel to the location of the fusible link by Voigtmann "at a point opposite the opening" of the window. No one can doubt that its location at or near that point more quickly subjected it to the current of rising hot air than it would have been if it had been located further away from the opening, especially so if the fire came from outside the building; but such location of the fusible link, where it reasonably should be placed to insure the performance of its intended function, is so obviously proper as not to impress it with the inventive quality. Any one, arranging a device of the kind in question, at all familiar with the laws of physics, would instinctively place the link required to be speedily consumed where the fire would naturally reach it quickest.

The argument made by counsel for appellants in favor of patentability based on the utility, public acceptance, or magnitude of sales of the patented article is appropriate in cases of doubtful invention, and sometimes is sufficient to turn the scale; but as we are unable, in view of the prior art, to consider the question of invention doubtful, but, on the contrary, hold that the inventive faculty was not exercised by Voigtmann, the argument avails nothing to appellants. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800; Adams v. Bellaire Stamping Co., 141 U. S. 539, 12 Sup. Ct. 66, 35 L. Ed. 849;

Grant v. Walter, 148 U. S. 547, 13 Sup. Ct. 699, 37 L. Ed. 552; Duer v. Corbin Cabinet Lock Co., 149 U. S. 216, 13 Sup. Ct. 850, 37 L. Ed. 707; Union Biscuit Co. v. Peters, 125 Fed. 601, 60 C. C. A. 337; Mast, Foos & Co. v. Stover Mfg. Co., supra.

The question of patentable invention now under consideration has been heard and determined adversely to complainants by the Circuit Court of the Northern District of Illinois (133 Fed. 934), the Circuit Court of Appeals for the Seventh Circuit (Voigtmann v. Perkinson, 138 Fed. 56, 70 C. C. A. 482), and by the court below in this case (133 Fed. 298). These courts have differed somewhat in their reasons, but all have reached the same conclusion—that the patent is void for want of invention. Observing the principle announced in Mast, Foos & Co. v. Stover Mfg. Co., supra, we should at least give those prior adjudications, made upon substantially the same record as is now before us, the most serious consideration and persuasive force. This we have done; and having examined the question independently, and having reached a conclusion in harmony with them, we most justly feel the greater confidence in its correctness.

The decree of the Circuit Court, dismissing the bill, is affirmed.