# BRYANT ELECTRIC CO. v. RENO SALES CO., Inc.

(District Court, E. D. New York. April 13, 1926.)

1. **Patents ⬥25—Aggregation of old elements is not patentable, nothing new being "invented" or "discovered."**

An aggregation of old elements is not patentable, because nothing new has been "invented" or "discovered."

2. **Patents ⬥25—New element added to aggregation of old ones may make patentable combination.**

A new element added to an aggregation of old ones may effect a new and useful result, and the combination may be patentable.

3. **Patents ⬥178—Equivalents carefully considered, where patent is of limited scope.**

Where a patent is for an invention of limited scope, what is an equivalent should be very carefully considered.

4. **Patents ⬥173—In primary and useful invention "substantial" will cover numerous and important differences in infringing device.**

Where an invention is strictly primary, and especially if it is entirely useful, the word "substantial" will be made to cover differences alike numerous and important, and even highly creditable to the infringer.

5. **Patents ⬥235—Infringement is tested by results in practical, not theoretical, operation.**

If in practical operation a machine performs to an appreciable extent the same function as a patented machine, infringement may be claimed, though there may be a theoretical difference.

6. **Patents ⬥328—1,181,046, for electric lamp switch, held invalid for want of invention.**

The Tizley patent, No. 1,181,046, for improved electric lamp switch, claims 1, 2, and 11, held invalid for want of invention, in view of the prior art, and especially of the Stirn patent, No. 515,485.

In Equity. Patent infringement suit by the Bryant Electric Company against the Reno Sales Company, Inc. Decree for defendant.

Decree affirmed 16 F.(2d) 797.

Howson & Howson, of New York City (Hubert Howson, of New York City, of counsel), for plaintiff.

Charles C. Gill, of New York City (Max W. Zabel, of Chicago, Ill., of counsel), for defendant.

INCH, District Judge. On April 25, 1916, a United States patent, No. 1,181,046, was granted to plaintiff, as assignee of the inventor, Arthur J. Tizley. It was for an improved electric lamp switch. Plaintiff is a Connecticut corporation. It brings this suit, alleging that the defendant, a New York cor-

poration, with a regular and established place of business in Brooklyn, Eastern district, has infringed the patent.

So far as I can see, plaintiff has enjoyed a more or less exclusive use of this patent for eight years. The bill of complaint also alleged, as a basis for relief against defendant, a certain Thomas United States patent, No. 1,246,493. On consent of both parties at the trial, this patent was eliminated and the complaint dismissed as to it.

The issue, therefore, is confined to the validity, etc., of the said Tizley patent. By stipulation (filed March 8, 1926), in addition to the usual provisions as to use of copies, dates of publications, etc., the following facts were conceded: The incorporation of plaintiff and defendant, plaintiff's title to the Tizley patent, sale by the defendant at its store in Brooklyn of the alleged infringing device, the notification of defendant by plaintiff that the sale of such device violated the rights of plaintiff, and the continued sale of same by defendant.

It was also stipulated that the alleged infringing device is manufactured by a corporation, the McGill Manufacturing Company, having a place of business in the state of Indiana, which corporation has undertaken the defense of this suit; that said corporation issued a catalogue, No. 20, illustrating therein the alleged infringing device sold by defendant.

The defendant relies on two defenses:

First, that the alleged invention of Tizley is invalid by reason of the state of the art at the time Tizley claimed he discovered something; in other words that Tizley, in spite of the granting to him of the letters patent, and the importance to be given such act of the government, did not in fact discover anything that could be patented, and hence was and is not entitled to prevent the defendant or anybody else from making, using, and selling that which was already well known in the art, or which an ordinary skilled mechanic could accomplish.

Second, that, even if Tizley did discover something, his claims, as finally appearing in the letters patent granted to him, giving thereto the ordinary construction and meaning, show that defendant's device does not infringe.

We will take up these defenses in the above order. Tizley states at page 1, line 10, of his patent (Tizley patent, No. 1,181,046, Plaintiff's Exhibit 1):

"My invention has for its object to provide an electric lamp switch which may be disposed within a porcelain candle fixture of the ordinary construction, and which may be operated from an end of the said porcelain candle fixture."

And in the description of the drawings the Tizley specification says (lines 27–29):

"Figure 1 is a sectional view of a porcelain candle fixture, the switch being disposed within the porcelain candle."

Again, the opening sentences of the detail description refer to the same thought in this language (lines 38–45):

"By referring to the drawings, it will be seen that the lamp wires 10 and 11 are disposed in a tube 12, and that to this tube 12 there is secured by a set screw 13 a disk 14 on which is disposed the porcelain candle 15, this porcelain candle 15 being of the usual construction. Within this porcelain candle the lamp switch 16 is disposed."

Then follows a description of the details of construction of the switch with its associated lamp terminals *within* the candle tube. The features of this construction are clearly illustrated in Figures 1 and 2 of the drawing of this Tizley patent. The details do not here need to be gone into. It will suffice to point out the general features, which comprise the two horizontal insulating buttons, marked 18 and 26, united to each other by the two conducting standards 19 and a third standard 25, and having mounted between these buttons and standards the switch. This switch structure is mounted upon the upper end of the tubular conduit 12, which is cut away at the side near its top, as shown at the left of Fig. 1, for the emergence of the insulated electrical conductors 10 and 11. The bared ends of these conductors are connected to the binding terminals 20 on the standards 19. On the top of this switch structure are mounted the lamp terminals, consisting of the usual Edison screw shell 30 and insulated center contact 28, these terminals being connected to the conducting wires 10 and 11, one directly and the other through the switch in the circuits, which it is unnecessary to trace in detail.

The switch includes a vibrating segment 37, pivoted on a horizontal axis 33, and moved to and held in its position of rest by a coiled spring 40 (Fig. 2), and pulled in the opposite direction by the flexible chain 43. Through an intermediate ratchet, successive pulls on this chain 43 will give to the switch member 21 a quarter turn at a time, to make or break the electric circuit. This pull chain 43 passes down through the space between the interior wall of the candle casing (which is in the form of a porcelain tube 15) and the upper end of the tubular conduit 12.

The patentee describes a means for im-

parting pulls to the chain by turning the collar *52* on its vertical axis, *or*, if preferred, *the lower end of the pull chain may be passed out through an opening 55 at the lower end of the base*, as shown in Fig. 6 and provided there with an enlarged ball which may be grasped by the fingers to operate the switch." (Plaintiff's brief.)

The file wrapper (Defendant's Exhibit A) shows certain rejections, etc., and the claims finally allowed, and which plaintiff now claims defendant's device infringes, are as follows:

Claim 1: "A candelabra switch, comprising a tubular wire conduit, an insulating switch body mounted at one end of said conduit, a hollow candelabra body incasing said switch and wire conduit, a rotary switch member mounted on an axis extending transversely of the candelabra body and means for operating the rotary switch, said means extending between the wire conduit and the candelabra body to one end of the latter."

Claim 2: "A candelabra switch, comprising a tubular conduit, an insulating switch body mounted at one end of said conduit, a hollow candelabra body incasing said switch and wire conduit, a rotary switch member mounted on an axis extending transversely of the candelabra body and means for operating the rotary switch, said means extending between the wire conduit and candelabra body to one end of the latter, in combination with a lamp socket mounted on said insulating switch body substantially in line with the wire conduit, but at the opposite end of the switch body therefrom."

Claim 11: "A candelabra socket, comprising a tubular wire conduit, an insulating switch body mounted at one end thereof, socket terminals mounted on said switch body in extention of the wire conduit, a candelabra casing inclosing said switch and wire conduit and a flexible switch-operating member arranged within said candelabra casing and concealed thereby, substantially as described."

It is on these claims, 1, 2, and 11, that plaintiff solely relies in this suit. The defendant's combination device (Plaintiff's Exhibit 2) would appear to be substantially the same as that manufactured by plaintiff and described in the Tizley patent in question. I say substantially, for there are differences in construction. These differences appear to me to be equivalents of those used by the plaintiff, although defendant claims that, if the Tizley patent is declared valid, these differences would be sufficient to avoid infringement by it.

This statement would seem to be justified

if the changes made by Tizley in his combination over that shown by the prior art shown in the Stirn patent, No. 515,485 (1894), Paiste patent, No. 965,734, and others, to be hereafter briefly referred to, should be considered sufficient to protect Tizley. Such changes, among others, are an attached, instead of a detached, "neck," "base," "pipe," or "conduit," or in their form, or the change in the operation of the chain pull switch. To me, however, both and all such changes would seem to be equivalents. This, of course, is aside from the alleged invention or discovery of Tizley, in the insertion by him of his combined switch and socket *inside* the candle barrel, a point that will also be hereafter mentioned.

Bearing in mind, therefore, the general resemblance of defendant's combination to that disclosed by Tizley's patent in suit, the following differences in defendant's device are also claimed by defendant:

Defendant's structure is said to be standard size, while the Tizley structure is confined to the "candle" size, which is somewhat smaller in the art. In the defendant's structure, "the idea seems to be more one of building up from the terminal of the fixture pipe. At the top of the fixture pipe there is an attachment nipple, and that nipple has a bracket, on the upper part of which the switch is supported. The insulating parts are not really part of the supporting body. They are supported upon the bracket, but the operating part of the switch is on the bracket, and the insulating shell is rather inclosed around the operating part of the switch. In the Tizley patent there is a tubular wire conduit, which extends up from the bottom from the connection with the fixture pipe and carries at its top the insulating body, consisting of the two insulating discs that are spaced apart by means of two conducting standards.

"In the defendant's structure there is claimed to be no tubular wire conduit, as in the Tizley device. The defendant merely has the attachment nipple, and the only thing in the nature of a tubular conduit is the end of the fixture pipe."

In other words, Tizley has a tube support, while defendant uses a section of the tube for a support. There is also an alleged difference in the function of the switch. Tizley's switch proceeds in quarter turns down and around the circle, alternately making and breaking the circuit; while the defendant's switch makes a quarter turn on the circle, and then reverses to make and break the circuit.

Defendant's position therefore really is (aside from this question of slight differences

in structure to avoid infringement if Tizley has a valid patent), as stated at page 27 in its brief: "Defendant contends that it has done nothing but what the prior art gives it permission to do. Aside from the fact that defendant's switch structure as such is patented, by which we mean the mechanism itself which is included within the porcelain casing, defendant did not even think it desirable to apply for a patent on its completed article as now complained of, for the reason that it considered the attaching of a bracket to a completed structure as of no inventive value."

It will be seen, and I am of the opinion is undisputed, that plaintiff limits its patent (Tizley) to the "candle type" of fixture. The use of the term "candelabra," if taken as defined by the dictionary, is not as narrow as this; but apparently in the trade both the words "candle" or "candelabra" indicate a socket of the "candle type." So Tizley, in his specification (patent No. 1,181,046, page 1, line 10), uses the words "candle fixture," while in his claims (1, 2, 11) he uses the words "candelabra switch" or "candelabra socket."

"Candelabrum (singular); candelabra (plural). A candlestick or lampstand having several branches. A stand supporting several lamps. Sometimes also candelabra is used as a singular, with candelabras as plural." (Standard Dictionary.)

For substantially 13 years—that is, from 1904 to 1917—the Caldwell Company were making electrical fixtures of the candle pull socket type illustrated by the Wagner patent, No. 761,563 (Plaintiff's Exhibit 5). This was called a rotary socket. It operated only one way, turning counter clockwise, so that it was very often broken, because one would ordinarily expect to turn the socket clockwise. It also had objections as to size, expensive installation, and of wiring; but so far as I can see that was the condition of the prior art at the time, so far as candelabra were considered.

Tizley attempted to improve on the Wagner rotary candle socket with his patent No. 1,108,641 (Plaintiff's Exhibit 6) and patent No. 1,162,665 (Plaintiff's Exhibit 7). Tizley states that thus far he had in a sense improved on Wagner by making the rotary socket "foolproof," in that it could be rotated in either direction without breaking the wire connection. It was also reduced in size. None of these ideas accomplished the result which now seems to be much in demand.

The idea was to have a candlestick as near as possible like the old time candlestick, the candle casing simulating a real candle, and the operating mechanism so arranged as not to detract from the design of the original candlestick. The rotar was placed in a position so as to bring the chain straight down inside of the candle without a turn. According to Tizley, this was a step in advance of the Wagner and other sockets. When Tizley had assembled the structure in suit, the plaintiff, one of the leading manufacturers of that kind of fixture, purchased the idea and started the manufacture of the device while the patent application was still pending.

At that time the plaintiff was making the old types of candle sockets, the characteristic of which was that the candle socket switch was placed at the base of the candle. Another socket for receiving the bulb was at the wick end (as I prefer to call it) of the candle used, requiring an extension piece between the two, all of which was expensive, and the problem of wiring and repair in case of a break was quite prominent, for, according to Tizley it would take a skilled laborer nearly an hour to do such work.

These devices are illustrated in Plaintiff's Catalogue Exhibit 10 and consists of key switches, pull chain switches, and turn switches (Plaintiff's Exhibits 11, 12, and 13). In 1916 the plaintiff issued another catalogue (Plaintiff's Exhibit 14), and in this catalogue is illustrated for the first time the Tizley candle socket, the patent as to which is now in suit. Again, in 1920, plaintiff's catalogue for that year illustrates the device and combination (Plaintiff's Exhibit 15).

According to Tizley (stenographer's minutes, page 16) his construction has entirely eliminated the early constructions, such as Wagner, or his own prior patents, above referred to, and it is not without significance that on November 25, 1924, the McGill Manufacturing Company, which has undertaken the defense of this suit (stipulation in evidence December 18, 1924, pages 2 and 4, inclusive), sent a letter to the trade, in which it extolled its own device, describing it as a "new type candle pull socket," stating that "breakage," "variation," and "servicing" would be eliminated by it; that "it is the strongest candle pull socket made" (Plaintiff's Exhibit 16).

Defendant does not contend that the patent to Tizley (the one in suit, No. 1,181,046) has been anticipated. Its contention is, as I understand it, that Tizley invented nothing; that what he claimed was an invention was old, and that his alleged combination is simply an aggregation.

[1] An aggregation is not patentable. The usefulness of each element has been disclosed.

A skilled mechanic is all that is needed to assemble. There is no change in function, or in results, except possibly it may work more efficiently or safely, or less expensively, but that which has been "discovered" has already been disclosed. Theoretically there is nothing new; what is "discovered" existed before discovery. The incentive is really given to "discover" that which already exists, provided the discovery adds something, however slight, to the sum total of commercial life in a useful and practical manner.

[2] So, where certain elements are gathered together, aggregated, but by the addition to them of a new element that has been "discovered," or by experiment, or even on rare occasions by accident, the new "idea," instead of being added, appears in the form of a "discovery" of a new result or use, the whole combination may become again patentable solely because it contains this new element, result, or use when found useful and commercial. It is a "step" in advance. "Invention" walks forward, never backward.

Where a situation exists such as is disclosed by this record, the natural impulse is to reward the skilled workman who has labored patiently for 20 years or more, and has finally disclosed a commercial device which has met with immediate approval, and which apparently others are availing themselves of. But while there may be, on proper proof of facts, other remedies available to him, the law does not give to such skilled workman the temporary monopoly of the product disclosed, unless it represents some invention on his part. In other words, if the work done is simply the skillful assembly of that which has been already "discovered" by others, and in the new assemblage or aggregation the products of these previous inventors function exactly as was intended by them, it is to these inventors that the word "invention" applies, and the reward of the skilled workman must be in the other direction. See Cutler Hammer Mfg. Co. v. Beaver (C. C. A.) 5 F.(2d) 457.

[3] To be sure, in a doubtful case the court may consider with some confidence the reception given to a new construction by the market, and there is evidence here that Tizley's construction for the past nine years has been well received; but there possibly may be other reasons, such as the change in style of fixture, the advance in lamps, the desire of decorators, etc. If, however, Tizley has invented something by his construction, however slight, he should be protected. In the limited scope of his invention, if any, what is an equivalent would have to be very carefully considered. Pope Mfg. Co. v. Gormully, 144

U. S. 242, 12 S. Ct. 637, 36 L. Ed. 420; Sessions v. Romadka, 145 U. S. 45, 12 S. Ct. 799, 36 L. Ed. 609; Knapp v. Morss, 150 U. S. 230, 14 S. Ct. 81, 37 L. Ed. 1059; Miller v. Eagle Co., 151 U. S. 204, 14 S. Ct. 310, 38 L. Ed. 121.

[4] It should not be overlooked, in considering the prior art and particularly the Stirn patents, which we will soon discuss, that "when the invention at bar is strictly primary, and especially if it is entirely useful, then the word "substantial" will be made to cover differences alike numerous and important, and even highly creditable to the infringer." The Telephone Cases, 126 U. S. 537, 8 S. Ct. 778, 31 L. Ed. 863, Walker on Patents (5th Ed.) p. 447.

I have already indicated that, before Tizley got his patent, he had considerable difficulty at the Patent Office, as indicated by the file wrapper. Mr. Tizley, working on the problem of adapting the electric light to a candle fixture, was well aware of the old ideas of switches; but the difficulty was that, when the electric light bulb or lamp had to rest at the "wick end" of the candle and the lighting switch had to go at the other end, the skilled workman of the different manufacturers had already, to a certain extent, solved the problem of connecting the wick or lamp socket by means of a support and accompanying wires to the base or switch socket, which in turn had its wires. This, however, presented difficulties and objections. It meant expense and skill in making and repairing the two sets of wires, and it prevented the yielding to the design of the candle, for the switch socket always had to be at its base.

It would appear that possibly others, and it seems to me surely Stirn, had, so far as the record presented to me shows, discovered just the form of combined wick or lamp socket and switch socket and tubular support which could be inserted in the candle barrel and avoid all this extra wiring expense and interference with design. To be sure, Stirn did not specify candles (perhaps they were not available in the fixture art at that time or desired); but I am quite confident that the Stirn device, which is a practical one to-day, would do exactly what the Tizley and defendant's device are now doing.

It is plain that Tizley did not know of Stirn, and the Patent Office did not discover Stirn. Tizley, therefore, accomplished a desired result by his own efforts and was allowed a patent, a fact to which due importance should be attached, as well as the fact that for years his article has been a commercial success. But does this mean that Tizley "in-

vented" the combination of lamp and switch socket on a tubular support that could be inserted in a casing or candle, or did Stirn invent that which, when once shown to or found by a skilled mechanic, could be availed of, and the same result as produced by Tizley achieved.

Defendant has cited the following patents showing the prior art, which I shall not attempt to arrange chronologically: Benjamin, 1,102,639 (1914), a pull switch socket. It had for one of its objects avoidance of the fixture being jarred, and the ability to tilt in case it was accidently struck. Anderson, No. 1,025,230 (1912), cited by the Patent Office when original claim 1 of Tizley was rejected. Wagner, No. 985,234 (1911), also mentioned by the Patent Office. Brady, 973,747 (1910), also a pull socket. Paiste, 965,734 (1910), referred to elsewhere in this opinion. Huffer, 804,849 (1905), for conventional candlesticks, and having the same general idea as that of Wagner and the former Tizley patents for a switch at the base of the candle. Uschmann, 797,090 (1905), mentioned by the Patent Office, consisting of a device which could be used for regulating currents through arc lamps or, if desired, connected to the socket of an incandescent lamp. Huffer, 789,914 (1905), another base-operating candle lamp, as well as Wagner, 769,563 (1904), of the same general application, and the two patents of Stirn, 515,484 and 515,485 (1894), elsewhere mentioned in this opinion; and finally the patent to Herrick, 435,931 (1890), on which the Patent Office originally rejected claim 2.

It is apparent, in reading these various patents, that combined lamp and socket structures have for many years been known in the art and mounted upon various kinds of supports, whether they were called "necks," "conduits," "bases," or by some other name. It also appears from the file wrapper that the original claims of Tizley (which were rejected), No. 1 and No. 2, read as follows:

"1. In an electric lamp switch, an elongated hollow member, a rotary switch member mounted on an axis extending transversely of the elongated member, and means for operating the rotary switch member extending toward an end of the elongated member.

"2. In an electric lamp switch, an elongated hollow member, two conductors disposed in and extending longitudinally of the elongated member, and a rotary switch member mounted on an axis extending transversely of the elongated member for connecting electrically the two conductors."

After rejection these claims were amended to read:

"1. A candelabra switch comprising a tubular wire conduit," etc.

"2. A candelabra switch comprising a tubular wire conduit," etc.

Said claims 1 and 2 of the patent in suit are set forth elsewhere in full. In other words, the claims finally allowed designate and limit the Tizley patent in suit to the "candle type."

This candle adaptation was new, in the sense that the method, at that time, of dealing with the candle type of fixture had been to have what I have already described and termed the wick socket at the lamp end and the switch socket at the base of the candle. Unfortunately the Stirn patent was not discovered by the Patent Office and was not cited, and yet this Stirn device is described in the patent (Stirn, 515,485, by reference to Fig. 1 and Fig. 6) to be a *combined wick socket and switch socket;* "the socket is constructed with a cylindrical shell $A$, provided with a bottom piece $A^1$, having a neck $A^2$ by which it is fastened to the chandelier, bracket, etc. Lines 36–39, specification.

Stirn calls the means of attachment a "neck," instead of a conduit, or a tubular conduit; but a "neck" is round, and it seems to me that cutting away a portion of it, so as to make a hole in one side, such as Tizley does, or cutting away three-quarters of it, so as to make merely a substantial support, such as defendant's structure has, would not make a material difference on the point of invention.

There also seems no good reason to me to differentiate on the point of invention between the "shell" mentioned by Stirn and the "candle shell" claimed by Tizley and defendant. However, if such differences were not considered equivalents, the differences between defendant's structure and Tizley's disclosure might fairly be said to be sufficient to prevent infringement by the defendant.

The point really is, it seems to me, to be that stated by plaintiff, in its brief at page 17, as follows: "For the purposes of Tizley's invention it is of no consequence whether there be little or much of the wire conduit within the candle cases. The *essential* thing is that the switch and its insulating supporting body are mounted *within* that casing, and since that insulating switch body is mounted upon the wire conduit it would follow that a piece of the wire conduit would be within the candle casing, but how much is of no practical importance."

To be sure, the Stirn patent was granted

in 1894, but it is not unable to function to-day at the "wick end" of the candle, provided the "neck" is long enough to place the combined socket and switch at that place. Stirn did not place it in a candle barrel, nor did he claim his invention was limited to the candle type.

What seems to be new, therefore, was the "discovery" by Tizley, although he did not know he was doing just that, that the Stirn socket and switch could be inserted in a candle barrel. Now who invented the combination that could be so used; did Stirn or did Tizley? The Stirn patent states the down pull alongside the neck inside the casing *the same as Tizley's.*

Stirn states at page 2 of his specification (patent No. 515,485), lines 2–6: *"In case the lamp is held vertically and projecting upwards, the cord S is passed through the aperture in the base* $A^1$, *of the socket."* Changing the word "cord" to "chain" and covering the structure with a candle barrel, we have Tizley's discovery.

Tizley may have intended to limit his patent to the words in claim 11, "concealed thereby," but as to that in all the structures offered in evidence by plaintiff as representing Tizley's device there is no attempt to "entirely" conceal the chain, and, on the contrary, in each instance, the chain hangs down a short distance below the fixture, with a ball at the end for convenience in operating the lamp. I do not think it necessary to hold that the word "concealed" means "entirely concealed," nor do I understand counsel for plaintiff to contend for any such meaning. However, if such is said to be the "invention" of Tizley, as based on the words in claim 11, supra, then the Tizley patent, so far as these parties are concerned, may be valid; but assuredly in that case the defendant's structure would not infringe, and a decree would have to go for defendant.

The real contention of plaintiff is well expressed by its expert, Mr. Hammer (stenographer's minutes, page 51): "Q. As I understand you, then, Mr. Tizley arrived at the new combination possibly of what was known elements, producing a new and very much desired result and cheaper device? A. There is no question about it. Everybody knew what a socket was, and how to make it. Everybody knew what a switch was, and how to make one. They knew what a conduit was, and how to make one. They knew what a candle body was, and how to make one. But this man for the first time brought those elements together in a novel way and produced a new result."

It seems to me that the question still remains: Was this result "invention"? We have already referred to the case of Cutler Hammer Mfg. Co. v. Beaver, supra, and the following, from the opinion of the Circuit Court of Appeals, Sixth Circuit, seems to me to well state the situation here. That court, in deciding against invention, stated as follows:

"There is a recognized exception to this rule, or rather counterpart of it, when in the new combination a new mode of operation is effected which produces an original result, as we said in Dowagiac Mfg. Co. v. Superior Drill Co., 115 F. 886, 901, 53 C. C. A. 36. But this must be something novel in principle, and not a combination operating upon a principle which was common to the old machines from which the elements were taken, as in the case at bar. For the reasons stated, we are of the opinion that there was no patentable invention in the Reist patent. We admit that it exhibits a good, a skillful, and perhaps a more useful piece of workmanship than had before been attained. But it is in substance only an illustration of the principles discovered and applied by his predecessors, by means the same as, or equivalent to, his own. It is stated and pressed upon our attention that separators like his have gone into extensive public use. But it is easy to see how this might happen without attributing to the patent anything new in principle. A thing or a combination of co-operating parts may be invented, and the original embodiment of it be shown in a crude and imperfect form. The skill of the trained workman will develop the idea of the inventor in more refined, more delicate, and more exactly suitable forms than the original. He may cut away needless bulk; he may increase the size of parts; he may make them stronger, if need be, by the substitution of one familiar material for another—make them lighter or heavier; he may divide one part into two, or combine two in one, or make any other transformation of details, so long as he is pursuing and working out the original discovery or invention by the exercise of the insight, good judgment, and expertness which he is expected to possess and apply. And this improvement may go on so long as any improvement in bringing the means already supplied to greater perfection can be made, and yet it continues to be only an embodiment of the primal idea.

"In all the useful arts such improvement as this is being continually carried forward. It is easy to understand that purchasers should prefer and insist on having the article, especially if it be a machine, in its best form, and the latest improvement would be likely

to measurably supersede the older one. Another thing which affects the value of the presumption arising from the general acceptance and use of a thing is that in modern usages of trade such articles are often pressed upon the attention of purchasers, instead of being chosen; and in many instances an article gets into general use from being pushed upon the market by energetic tradesmen with strong financial backing. No doubt the presumption still obtains, but it does not, and for that matter never did, have a controlling influence, unless the question of invention hangs in doubt. And our impressions of the present case are such that we do not invoke the presumption as a helping factor." Bullock Electric Co. v. General Electric Co. (C. C. A.) 149 F. 409.

This is not a case "where several elements, no one of which is novel, are united in a combination which is the subject of a patent, and these several elements are thereafter united with another element into a new combination, and this new combination performs a work which the patented combination could not." U. S. v. Berdan Co., 156 U. S. 552, at page 565, 15 S. Ct. 420, 424 (39 L. Ed. 530).

"The new result which a combination is required to obtain is a result which is new and distinguishable as compared with results produced by the elements in their separate state, or as assembled in a mere aggregation, without functional relation to each other." Deere & Co. v. Rock Island Plow Co. (C. C. A.) 84 F. 171; Hanifen v. Godshalk (C. C. A.) 84 F. 649, at page 651.

Heinz Co. v. Cohn (C. C. A.) 207 F. 547, at page 557:

"A few principles in patent law may be stated as an aid towards a solution of the problem before us. A combination of old elements, which performs no new function and accomplishes no new results, does not involve patentable novelty. Knapp v. Morss, 150 U. S. 221, 227, 14 S. Ct. 81, 37 L. Ed. 1059. Nor does the mere aggregate of several results, each the complete product of one of the combined elements, involve inventive faculty. Mosler Safe Co. v. Mosler, 127 U. S. 354, 361, 8 S. Ct. 1148, 32 L. Ed. 182. Nor is the mere extension of the use of an old combination of elements invention, where no new result is produced and no new method is found for producing the old result. Voigtmann v. Weis & Ridge Cornice Co., 148 F. 848, 78 C. C. A. 538. See, also, Schweichler v. Levinson, 147 Fed. 704, 78 C. C. A. 92. But in a combination of elements that are old, whereby through their new relation they perform new functions and produce a new result,

there is patentable novelty. Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Taylor v. Sawyer Spindle Co., 75 F. 301, 22 C. C. A. 203.

"Mr. Justice Hunt states the principle succinctly in Reckendorfer v. Faber, 92 U. S. 347, 357 (23 L. Ed. 719). He says: 'The combination, to be patentable, must produce a different force or effect, or result in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union; if not so, it is only an aggregation of separate elements.' See, also, Pickering v. McCollough [McCullough] 104 U. S. 310, 26 L. Ed. 749."

See Lavigne Co. v. McCanna Co. (C. C. A.) 194 F. 112, at page 113. See, also, Id. (C. C.) 177 F. 709; Read Co. v. Jaburg (D. C.) 221 F. 662, at page 665.

The doctrine of the courts is that "one who claims and secures a patent for a new machine or combination thereby necessarily claims and secures a patent for every mechanical equivalent for that device or combination, because within the meaning of the patent law every mechanical equivalent of a device is the same thing as the device itself."

In a learned opinion based upon the principle stated Judge Sanborn, in Kinloch Tel. Co. v. Western Electric Co., 113 F. 652, 51 C. C. A. 362, wrote:

"In determining what is a mechanical equivalent of a given device, where, as in the case at bar, form is not the essence of the invention, forms and names are of little significance. The similarities and differences of machines * * * are to be determined by the offices or functions which they perform, by the principles on which they are constructed, and by the modes which are used in their operation. A device which is constructed on the same principle, which has the same mode of operation, and which accomplishes the same result as another by the same or by equivalent mechanical means, is the same device, and a claim in a patent of one such device claims and secures the other."

[5] It is not necessary that a function always be performed in identically the same way or to the same extent. Theoretically there may be a difference, but if, in practical operation, the one machine performs to an appreciable extent the same function as the other, infringement may be claimed. Beach v. Inman (C. C.) 75 F. 840; Sly Mfg. Co. v. Russell & Co., 189 F. 61, 110 C. C. A. 625.

I have been unable to escape the conclusion that, as far back as 1894, Stirn (possibly others later) disclosed to the world by plain specifications and drawings a combina-

tion device that not only would function efficiently to-day within a candle casing, but was then intended to be used in any kind of electric lamp fixture, although not limited to any kind, and would produce the desired result of a lighted candle or lamp as the case may be.

Possibly in 1894, because of the condition of the fixture market, in designs, demands, and state of the art of lamp making, Stirn never thought of the candle lamp, yet he had presented a device that would have worked inside a candle casing, if necessary. Assuredly Tizley did not know of Stirn's disclosures. His putting of the Stirn combination inside the candle casing 20 years afterward would not seem to be invention, although Tizley was not actually aware of what Stirn had disclosed. The result was new to Tizley, and possibly others, but it had been pointed out by Stirn and others.

There was no new use of the Stirn device. It did not function differently. If there was evidence before me that the Stirn structure would not function inside the candle at all, or even as well as outside, there might possibly be invention. There is no such proof.

On the trial it seemed to me that possibly this was the situation, but after careful examination of all the exhibits it now seems to me that the Stirn device would function just as well in or out side the candle, and certainly, if necessary, to merely take the shell from around it, or decrease its size, or lengthen its tubular base, would not be invention, for the result, the function, the use, remains the same.

[6] This leads me reluctantly, but in my opinion correctly, to hold the patent invalid, in view of the prior art, and therefore it becomes unnecessary to pass upon the question of whether or not the defendant infringed.

Submit decree.