**Elbert C. LEACH, Plaintiff,**

**v.**

**ROCKWOOD & COMPANY, Defendant.**

**No. 3416–Civil.**

United States District Court
W. D. Wisconsin.

June 29, 1967.

Arthur H. Seidel and Allan W. Leiser, Milwaukee, Wis., Joseph G. Werner, Madison, Wis., for plaintiff.

Joseph P. House, Jr., and Henry C. Fuller, Jr., Milwaukee, Wis., for defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is an action for infringement of Patent No. 2,580,306 issued December 25, 1951, on an application filed September 5, 1945, by Elbert C. Leach, Otto F. Manthie, and George D. Clapp. This action was commenced in this court on February 13, 1961. On April 15, 1966, a supplemental complaint was filed in which infringement by defendant's modified or screw-fed impeller machine was charged. Prior to trial several *inter partes* tests of the devices involved were conducted at which the court was present as an observer. Trial of this action to the court took place on September 7–13, 1966. Extensive posttrial briefing was completed by January 1, 1967.

Plaintiff is a resident of the State of Wisconsin and resides at Oshkosh, Wisconsin. "Plaintiff is and has been the sole owner of the entire right, title and interest in the patent in suit, No 2,-580,306 since July 22, 1959." Plaintiff's Exhibit 67, paragraph 5.

Defendant is a Delaware corporation having a regular and established place of business at Fort Atkinson, Wisconsin, in the Western District of Wisconsin. Defendant does business under the name James Manufacturing Company. Prior to January 1, 1959, James Manufacturing Company was an independent firm, but on or about January 1, 1959, it was purchased by Rockwood & Company. Hereinafter I shall refer only to the James Manufacturing Company, without differentiating its status as an independent firm or as a division of Rockwood & Company.

"Defendant made and sold its Volumatic silo unloaders from June 1957 to about October 22, 1962, and on or about October 22, 1962 defendant began to make and sell the 'modified' Volumatic silo unloader, which it continued to make and sell until the sale of its business to Butler Manufacturing Company, such sale being closed some time after July 14, 1964." Plaintiff's Exhibit 67, paragraph 6.

The court concludes that proper parties are prosecuting and defending this lawsuit.

This court has jurisdiction over the parties and subject matter of this action and venue is proper in the Western District of Wisconsin. 28 U.S.C. § 1338(a): "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent and copyright cases." The Act of Congress relied on in this case is 35 U.S.C. § 271 (a), which defines infringement of patents. 28 U.S.C. § 1400(b) "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

This opinion and order is based upon a full consideration of all the exhibits, files, records, and proceedings in the above entitled matter. This opinion and order embodies findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure. See Frank Adam Elec. Co. v. Federal Elec. Prods. Co., 200 F.2d 210, 212 (8th Cir. 1952), cert. denied, 345 U.S. 958, 73 S.Ct. 940, 97 L.Ed. 1378 (1953); Smith v. Dental Prods. Co., 168 F.2d 516, 518 (7th Cir. 1948).

Plaintiff contends that the Volumatic silo unloader made and sold by defendant

prior to October 22, 1962, infringes Claims 2, 6, 8, 11, 12, 15, 16, 17 and 20 of the patent in suit. Plaintiff contends that the modified Volumatic silo unloader made and sold by defendant after October 22, 1962, infringes Claims 6, 8, 11, 12, 15, 16 and 17 of the patent in suit. These claims read:

"2. A silo unloader, for installation in a silo above the surface of the silage, comprising a vertically movable frame, means for suspending and lowering the frame in the silo, a cutter journaled in the frame at the center of the silo for rotation relative to the frame in a substantially horizontal plane, blades on the cutter for loosening the silage at the upper surface of the latter and working the loosened silage in toward the center of the silo, an air duct having an unobstructed vertical inlet portion mounted on the frame at the center of the same and leading upwardly from the cutter adjacent the center of the silo, and means mounted on the frame and associated with the duct intermediate the inlet and discharge ends of the same for creating an upward flow of air therein of sufficient intensity to cause the loosened silage to be sucked up into the duct for discharge laterally from the silo.

"6. A silo unloader, for installation in a silo above the upper surface of the silage, comprising a vertically movable frame, means for restraining the frame against free rotation, a cutter journaled in the frame at the center of the silo for rotation in a substantially horizontal plane, blades on the cutter for loosening the silage at the upper surface of the latter and working the loosened silage in toward the center of the silo, a pick-up duct leading upwardly from the cutter at the center of the silo above the point where the blades leave the loosened silage, silage conditioning means beneath the duct separate from the blades of the cutter for agitating the silage loosened by the blades to facilitate its becoming airborne, and suction means associated with the duct for causing the loosened silage to be picked up in the duct for discharge laterally from the silo.

"8. A silo unloader, for installation in a silo above the surface of the silage, comprising a vertically movable spider-like frame having a center portion and three horizontally radiating arms, which arms are adapted to engage with the sides of the silo to center the frame within the silo, three suspension cables connected to the arms, which cables are adapted to extend vertically over pulleys mounted above the same in the top of the silo and to be connected together beyond the pulleys whereby to support the frame against substantial tilting and provide in effect a single raising and lowering cable for the frame operable from a point outside the silo, said cables also acting to support the weight of the frame and to restrain the frame against rotation while allowing the frame to turn a part of a revolution, an arm journaled on a vertical axis in the center portion of the frame and extending horizontally beneath the frame for rotation in a horizontal plane, means associated with said last mentioned arm for loosening the silage and moving the loosened silage inwardly toward the center portion of the frame, means mounted on the frame for rotating said arm, and means also mounted on the frame for conducting the loosened silage to a point outside the silo, said conducting means including a portion which extends laterally between two of the suspension cables and is pivoted for horizontal movement relative to the frame.

"11. A self contained silo unloading machine for installation as a unit in a silo above the surface of the silage therein, comprising a vertically movable support adapted to be positioned centrally of a filled or partially filled silo, cable means connected with the support for suspending and progressively lowering the same in the silo, an electric motor anchored on the support for vertical movement with the latter, a

horizontally disposed silage collecting arm, which arm is pivotally connected on a vertical axis with the underside of the support in vertically fixed relation to the latter at a point adjacent the center of the silo and extends radially to a point adjacent the side of the silo, driving means for the arm operated by the motor for causing the arm to travel in a horizontal circle beneath the support about its point of connection with the latter, said arm including blade means for loosening the silage at the upper surface of the latter and moving the loosened silage in toward the pivotal axis of the arm, a rotary fan associated with the support for vertical movement with the latter, driving means for the fan operated by the motor for creating a flow of air, a relatively short suction duct at the pivotal connection of the arm with the support, which duct is open at its lower end and extends upwardly to the fan for receiving and directing into the fan the loosened silage brought in toward the pivotal axis of the arm by the operation of the blades, and a second relatively long pressure duct extending from the fan to a point outside the silo for conducting the loosened silage blown by the fan to the desired point of discharge.

"12. A silo unloader, for installation in a silo above the surface of the silage, comprising a vertically movable frame, means for lowering the frame in the silo, a cutter journaled in the frame at the center of the silo for rotation relative to the frame in a substantially horizontal plane, blade means on the cutter for loosening the silage at the upper surface of the latter and for working the loosened silage in toward the center of the silo, an air duct leading upwardly from the cutter adjacent the center of the silo, and means associated with the duct for creating an upward flow of air therein of sufficient intensity to cause the loosened silage to be sucked up into the duct for discharge laterally from the silo.

"15. A silo unloader according to claim 12, including agitators associated with the cutter and positioned immediately beneath the duct for directing the silage loosened by the blades into the duct.

"16. A silo unloader according to claim 12, including means for restraining the frame against rotation.

"17. A silo unloader, for installation in a silo above the upper surface of the silage, comprising a vertically movable frame, means for restraining the frame against free rotation, a cutter arm journaled in the frame at the center of the silo for rotation in a substantially horizontal plane, cutting means carried by the arm for loosening the silage at the upper surface of the latter and working the loosened silage in toward the center of the silo, a pick-up duct leading upwardly from the cutter arm at substantially the center of the silo above the point where the cutting means leaves the loosened silage, silage conditioning means beneath the duct separate from the cutting means for agitating the silage loosened by the cutting means to facilitate its becoming airborne, and suction means associated with the duct for causing the loosened and agitated silage to be picked up in the duct for discharge laterally from the silo.

"20. A silo unloader, for installation in a silo above the surface of the silage, comprising a vertically movable frame, means for suspending and lowering the frame in the silo, an arm journaled in the frame at substantially the center of the silo for rotation relative to the frame in a substantially horizontal plane, means for driving the arm to cause it to travel in a circle about its point of connection with the frame, cutting means carried by the arm for loosening the silage at the upper surface of the latter and working the loosened silage in toward the center of the silo, an air duct having an unobstructed vertical inlet portion mounted on the frame at substantially the center

of the same and leading upwardly from the arm adjacent the center of the silo, and means mounted on the frame and associated with the duct intermediate the inlet and discharge ends of the same for creating an upward flow of air therein of sufficient intensity to cause the loosened silage to be sucked up into the duct for discharge laterally from the silo."

On September 2, 1966, United States District Judge Robert E. Tehan decided Leach v. Badger Northland, Inc., Eastern District of Wisconsin, 272 F. Supp. 750. This case also involved charges of infringement of Patent No. 2,580,-306. Judge Tehan made findings of fact and conclusions of law, and held that Claims 6, 12, 15, 16, and 17 of the patent in suit are invalid. This holding by Judge Tehan is not res judicata in the instant case. See Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936); Aghnides v. Holden, 226 F.2d 949 (7th Cir. 1955); Northwest Eng'r Corp. v. Keystone Driller Co., 70 F.2d 13, 19 (7th Cir. 1934), aff'd 294 U.S. 42, 55 S.Ct. 262, 79 L.Ed. 747 (1935). However, substantial weight should be given to Judge Tehan's findings on issues which are identical to those faced by this court. Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 356 F.2d 442, 449 (7th Cir.), cert. denied, 384 U.S. 950, 86 S.Ct. 1570, 16 L.Ed.2d 547; 384 U.S. 1002, 86 S.Ct. 1925, 16 L.Ed.2d 1016 (1966): "The Bendix decision [Fourth Circuit case holding the patent in suit invalid] may by comity be given great weight by the district court after it hears testimony in a trial of the instant case on the merits. That consideration is committed to the discretion of the trial court." Brian Jackson Associates, Inc. v. San Manuel Copper Corp., 259 F.Supp. 793, 812 n. 1 (D.Ariz.1966):

"Very little of the evidence introduced in the Brian Jackson case had not been presented earlier before Judge Walsh—there were some differences in expert testimony. However, in all material respects, the issues and cited references were the same. Therefore, unless substantial evidence exists to the contrary, which I have been unable to find, the previous findings on validity should stand."

American Photocopy Equip. Co. v. Rovico, Inc., 257 F.Supp. 192, 194 (N.D.Ill.1966): "We are satisfied, initially, that the finding of validity by the Seventh Circuit Court of Appeals * * * is binding upon this Court in the absence of persuasive new evidence of invalidity * * * despite the difference in parties."

The record in this case fully supports paragraphs 5, 6, 8, 9, 10, 11, and 12 of Judge Tehan's findings of fact. Those paragraphs are hereby incorporated into this opinion and order.

"5. Silage consists primarily of corn or grasses chopped in the field into particles about a half inch in length and stored, without drying, as feed for animals. The structure in which it is stored is a silo. Figure 1 of the patent in suit shows what is apparently a typical silo—a cylindrical shaped structure with a conical roof beside which is a chute rising from an entryway at ground level. The chute encloses a portion of the structure having panels which can be removed, as silage is removed and the silage level lowered, to function as a doorway and outlet area. A ladder is normally adjacent to or a part of that opening. The sizes of silos vary, depending upon the size of farmers' herds and length of feeding seasons.

"6. In order to avoid spoilage of that portion of silage exposed to air in a silo, it is desirable to remove approximately three to four inches from the top per day and to effect this removal in even layers. This daily task if performed manually by a farmer who must first climb up the silo ladder to the silage level, is the third most arduous task on a farm, being preceded only by milking and barn cleaning. The silo unloaders described in the patent and those alleged herein to infringe are intended to ease the task of unloading

silage by mechanically loosening the silage on the surface of the silo, bringing it to the center, and discharging it."

See, e.g., Transcript of Trial, pp. 15–17, 63–74, 695, 914; Plaintiff's Exhibit 2.

"8. The silo unloader described in the patent has four main parts, a frame, a gathering means, a pick-up means and a discharge means.

"9. The frame, a beam of generally triangular cross-section, extends across the inside of the silo and can be adjusted to match the diameter of the silo. It is supported by cables from the top of the silo and can be moved vertically from ground level to follow the level of the silage, but it is restrained from rotation by a shoe engaging a vertical guide rail inside the silo on one end of the beam, and another shoe which fits the silo door. A variation of the frame is shown in Figures 11 and 12 of the patent having three radially disposed arms each of which has an antifriction roller which engages the silo wall which frame is capable of limited rotation.

"10. The gathering means is attached to a rotatable portion of an air duct below the frame and consists of a cutter or cutter arm which rotates in the silo, on which are mounted a series of curved blades, also referred to as blade means or cutting means, which loosen the silage and bring it to the center of the silo as the cutter rotates. Near the center of the silo and adjacent the air duct to which the cutter is attached is a pair of agitators having fingers of a length approximately even with the lower edge of the blades and driven separately from the cutter, which fluff up the silage to prepare it for pick-up.

"11. The pick-up and discharge means consist of a centrifugal fan in a casing attached to the non-rotatable frame, a suction pick-up duct extending from the center of this fan (being the area of greatest suction) to a point slightly above the silage floor at the center of the silo, and a discharge chute leading from the fan casing to the silo door.

That portion of the pick-up duct below the frame on which the cutter is mounted, rotates but the rest of the pick-up duct, the fan and the discharge means are stationary.

"12. The method of picking up the silage described in the patent, is dependent upon suction principles only, and cannot function without air. As the fan blades rotate, air is moved radially outward along the blades and an area of low pressure develops in the center of the fan which must be replenished through the pick-up duct which extends to a point near the silage floor, this being the only inlet in the casing. Silage moved by the blades on the cutter to the center of the silo under the pick-up duct and there fluffed up by the agitators is picked up by suction in this stream of replenishing air, brought to the center of the fan, blown radially outward along the blades, and discharged along the chute to the silo door."

See, e.g., Transcript of Trial, pp. 77–86, 95–98, 107–10, 114–16, 122–23, 126, 281–83, 288–304, 308–09, 312–13, 435–36, 485–87, 505–08, 582–86, 959–61, 966–67, 987–91; Plaintiff's Exhibits 1–9, 12–19, 47; Defendant's Exhibits 232, 248, 250.

■ Defendant has attacked all of the claims of the patent in suit as invalid because the Leach machine does not satisfy the initial statutory standards of patentability. 35 U.S.C. § 101: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." Because of a statutory presumption of validity, defendant has the burden of proving the invalidity of the patent. 35 U.S.C. § 282:

"A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid

claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it."

Walt Disney Prods. v. Fred A Niles Communications Center, Inc., 369 F.2d 230, 234 (7th Cir.1966): "We have held that such party has a heavy burden of establishing invalidity by clear and convincing evidence." See King-Seeley Thermos Co. v. Tastee Freez Indus., Inc., 357 F.2d 875, 879 (7th Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 38, 17 L.Ed.2d 56 (1966); Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100, 103 (7th Cir.1957), cert. denied, 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958). Copease Mfg. Co. v. American Photocopy Equip. Co., 298 F.2d 772, 777 (7th Cir.1961): "This presumption [of validity where a patent has been issued] * * * is not to be overthrown except by clear and cogent evidence." Artmoore Co. v. Dayless Mfg. Co., 208 F. 2d 1, 3 (7th Cir.1953), cert. denied, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075 (1954): "On the issue of validity we start, as we must in all patent cases and as the District Court no doubt did, with the presumption of validity which attaches to the grant. This presumption is not an idle gesture * * * but is a positive factor which must be overcome by one who asserts invalidity."

■ However, where relevant prior art has not been cited to the Patent Office, the presumption of validity is either weakened, see Milton Mfg. Co. v. Potter-Weil Corp., 327 F.2d 437, 439 (7th Cir. 1964); Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630, 640 (N.D.Ill.1966); Koehring Co. v. E. D. Etnyre & Co., 254 F.Supp. 334, 360 (N.D.Ill.1966); Walt Disney Prods. v. Fred A. Niles Communication Center, Inc., 253 F.Supp. 1, 3 (N.D.Ill.), modified, 369 F.2d 230 (7th Cir.1966); Briggs v. M & J Diesel Locomotive Filter Corp., 228 F.Supp. 26, 35 (N.D.Ill.1964), aff'd, 342 F.2d 573 (7th Cir.), petition for cert. dismissed, 382 U.S. 801, 86 S.Ct. 11, 15 L. Ed.2d 55 (1965), or destroyed, see Strzalkowski v. Beltone Electronics Corp., 371 F.2d 237, 240 (7th Cir.1966); T. P. Labs., Inc. v. Huge, 371 F.2d 231, 234 (7th Cir. 1966); Skirow v. Roberts Colonial House, Inc., 361 F.2d 388, 390 (7th Cir.1966); Townsend Co. v. M. S. L. Indus., 359 F. 2d 814, 817, 149 U.S.P.Q. 243, 245 (7th Cir.1966); Senco Prods., Inc. v. Fastener Corp., 269 F.2d 33, 34 (7th Cir. 1959), cert. denied, 361 U.S. 932, 80 S.Ct. 370, 4 L.Ed.2d 353 (1960); Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100, 105 (7th Cir.1957), cert. denied, 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958).

See also Michigan Magnetics, Inc. v. Nortronics Co., 245 F.Supp. 401, 402 (D. Minn.1965): "Such a presumption [of validity] is not conclusive, however, and is weaker in instances of so-called combination patents, since a rather severe test must be applied in light of the difficulty and improbability of finding invention in the assembly of old elements. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp. * * * ."

■ 35 U.S.C. § 101 requires that a device, in order to be patentable, must be "useful". The prompt and substantial commercial success of the machine described in the patent in suit, see Transcript of Trial, pp. 920–21, leads the court to conclude that that machine satisfies the statutory requirement of utility.

■ 35 U.S.C. § 101 also requires that a device, in order to be patentable, must be "new". A mere aggregation of elements which were known at the time of the application for a patent is not a patentable machine. The question of whether a combination of elements constitutes a patentable combination or a mere aggregation goes to the question of whether the novelty required by 35 U.S. C. § 101 exists. See Gould-National Batteries, Inc. v. Gulton Indus., Inc., 361 F. 2d 912, 915 (3d Cir.1966). A mere aggregation is not novel. See Bryant Elec. Co. v. Reno Sales Co., 16 F.2d 789, 792–793 (E.D.N.Y.), aff'd, 16 F.2d 797 (2d Cir.1926).

Patent No. 2,580,306 is a combination patent. The device described is a com-

bination of a frame, a means for gathering silage toward the center of the silo, a means for picking up this silage, and a means for discharging the silage from the silo. No one of these elements was unknown at the time this patent application was made. For example, Blaisdell Patents No. 826,646 and No. 884,559, Seidel Patent No. 844,693, Kennedy Patent No. 846,791, Lamb Patent No. 1,007,-954, Burgess Patent No. 1,233,308, Keys Patent No. 1,479,990, Foster Patent No. 1,550,311, and Kutz Patent No. 1,740,250 show types of frames. Blaisdell Patents No. 826,646 and No. 884,559, Lamb Patent No. 1,007,954, Burgess Patent No. 1,233,308, Holnagel Patent No. 1,274,548, and Holmgreen Patent No. 1,275,558, show means for moving material towards the center of a circular container. Parker Patent No. 1,020,307, Curtis Patent No. 1,413,007, Ronning Patents No. 1,-409,404 and No. 1,556,718, Foster Patent No. 1,550,211, Thiemann Patent No. 1,-619,277, and Rasor Patent No. 2,148,501 show means for picking up a substance and means for conveying that substance vertically and laterally. Schacht Patent No. 784,281, Steege Patent No. 1,611,291, Whiteside Patent No. 2,129,252, and Coultas Patent No. 2,373,169 also show devices which discharge substances upwardly and laterally. Some of these patents will be discussed in greater detail later in this opinion. Did the placing of some of these elements together to form a workable automatic silo unloader constitute invention? This court concludes that it did not.

■ The legal test of what constitutes a patentable combination is found in Brunswick Corp. v. Columbia Indus., Inc., 362 F.2d 172, 175 (9th Cir.1966): " 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' Lincoln Engineering Co. v. Stewart Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008 * * *." Each of the elements of the patent in suit per-

forms the same function as it did in the prior art discussed in this case. No unusual or surprising consequences flow from the combination of elements in the patent in suit. "The known elements employed in the patent took on no new quality of function from being brought into concert, and the improvement over prior art resulting from their unification is wanting in any unusual or surprising consequences. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp. * * *." Toro Mfg. Corp. v. Jacobsen Mfg. Co., 357 F.2d 901, 904 (7th Cir.1966). See also id. at 903, Bryant Elec. Co. v. Reno Sales Co., 16 F.2d 789, 793, 795–796 (E.D.N.Y.), aff'd 16 F. 2d 797 (2d Cir.1926); Strzalkowski v. Beltone Electronics Corp., 371 F.2d 237, 239–240 (7th Cir.1966).

"In assessing the patentability of combination patents, we are to apply a 'severe test,' whether 'the whole in some way exceeds the sum of its parts' to produce 'unusual or surprising consequences from the unification of the elements * * *,' Great A. & P. Tea Co. v. Supermarket Equipment Co. * * * ." Bentley v. Sunset House Distrib. Corp., 359 F.2d 140, 144 (9th Cir.1966). In reaching the conclusion that the combination patent in suit is not novel, we have applied such a "severe test." See Toro Mfg. Corp. v. Jacobsen Mfg. Co., 357 F.2d 901, 903 (7th Cir.1966): " '[t]he concept of invention is inherently elusive when applied to combination of old elements.' "

■ This court concludes that the patent in suit is comparable to the one involved in Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). We think the following statement by the Supreme Court appropriately points out that many good ideas, such as the idea to combine the elements known to the prior art into the machine described in the patent in suit, are not patentable.

"The courts below concurred in finding that every element here claimed (except extension of the counter) was known to prior art. When, for the first time, those elements were put to work

for the supermarket type of stores, although each performed the same mechanical function for them that it had been known to perform, they produced results more striking, perhaps, than in any previous utilization. To bring these devices together and apply them to save the time of customer and checker was a good idea, but scores of progressive ideas in business are not patentable, and we conclude on the findings below that this one was not."

Id. at 153, 71 S.Ct. at 130. See Automated Bldg. Components, Inc. v. Structomatic, Inc., 362 F.2d 529, 530 (7th Cir. 1966).

■■ A third requirement in addition to utility and novelty which must be satisfied by every patentable invention is set forth in 35 U.S.C. § 103:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

In applying this statutory test we must first determine what prior art should be considered. We must look at all the prior art in the fields of silo unloading and analogous arts.

"A. J. Deer Co., Inc., v U. S. Slicing Mach. Co., 7 Cir. 1927, 21 F.2d 812, at page 813:

'We are of opinion that whether arts or uses are analogous depends upon the similarity of their elements and purposes. If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then we are of opinion that such arts must be said to be analogous, and, if the converse is true, they are nonanalogous arts.'"

B. & M. Corp. v. Koolvent Aluminum Awning Corp. of Ind., 257 F.2d 264, 266–267, (7th Cir. 1958). "Reduced to simple terms of basic applicability here we believe the test is whether the art of sheet metal roofing is so remote that students of the art of sheet metal awnings would not naturally have looked there for help. * * * The answer is very obviously in the negative." Id. at 267. See Graham v. John Deere Co., 383 U.S. 1, 35, 148 U.S.P.Q. 459, 473–74 (1966); Koehring Co. v. E. D. Etnyre & Co., 254 F. Supp. 334, 352 (N.D.Ill.1966).

"Even though it should be held that patents relied upon by a defendant as prior art are in a non-analogous art, never the less their disclosures may not be ignored. * * *

"The trend of modern decisions including those of the United States Supreme Court is to widen the scope of the prior art which can be considered pertinent."

Endevco Corp. v. Chicago Dynamic Indus., Inc., 268 F.Supp. 640 (N.D.Ill.1967). This court concludes that patents dealing with silo loaders would be a natural source of information for one trying to solve problems relating to unloading silos. Thus Ronning Patent No. 1,556,718 is relevant prior art.

■■ Plaintiff has suggested that we must exclude from our consideration "paper patents", patents which describe devices which are not commercially operable. Although some of the prior art patents mentioned in this case showed devices which were not practical or operable, they still must be considered, if they divulge ideas which are significant. Something may be obvious from a mere "paper patent". The term "paper patent" is essentially meaningless; the same test of obviousness is to be applied in either case. Note the use of the inoperative Skrivanoff patent in United States v.

Adams, 383 U.S. 39, 47–48, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

Of course, the fact that a device is inoperative has bearing on what it teaches and on what would be obvious from it. "[K]nown disadvantages in old devices which would naturally discourage the search for new inventions may be taken into account in determining obviousness." Id. at 52, 86 S.Ct. at 714. "The fact that the switch Model 7110 was not commercially successful does not render it any the less a valid prior reference against claims 1 to 6 in issue." Endevco Corp. v. Chicago Dynamic Indus., Inc., 268 F.Supp. 640, 650 (N.D.Ill.1967).

" '[W]hen courts wish to discredit a reference, and do not quite know how to avoid it, they at times are fond of calling it a "paper patent"; but that is only rhetoric. The doctrine of "lost art" does not apply to earlier patents, as it does to prior uses * * *. A patent may have lain for years unheeded, as little a contribution to the sum of knowledge as though it had never existed, an idle gesture long since drifted into oblivion. Nevertheless, it will be as effective to invalidate a new patent, as though it had entered into the very life blood of the industry.' "

Genesco, Inc. v. Knapp Bros. Shoe Mfg. Corp., 152 U.S.P.Q. 793, 799–800 (N.D. Ill.1967), quoting Judge Learned Hand in Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345, 350 (2d Cir.), cert. denied, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945).

Given the relevant prior art as it stood at the time the patent in suit was applied for, we must then ask whether one having ordinary skill in the art would find the claimed invention obvious. "[U]nder the 35 U.S.C.A. § 103 nonobviousness requirement, it is enough to defeat a patent if from one or more related prior art patents, one having ordinary skill in the art would find the claimed invention obvious." Skirow v. Roberts Colonial House, Inc., 361 F.2d 388, 390 (7th Cir. 1966). "If what has been created demonstrates no more ingenuity than the work of a mechanic skilled in the art * * * then the product does not possess that 'impalpable something' characterized as invention. Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp. * * *." Zegers v. Zegers, Inc., 365 F.2d 156, 159 (7th Cir.), cert. denied, 385 U.S. 948, 87 S.Ct. 320, 17 L. Ed.2d 226 (1966).

In applying this test, it is irrelevant that the inventor may not have been aware of some of the prior art. Genesco, Inc. v. Knapp Bros. Shoe Mfg. Corp., 152 U.S.P.Q. 793, 797–798, 800 (N.D.Ill. 1967); Walt Disney Prods. v. Fred A. Niles Communication Center, Inc., 253 F. Supp. 1, 4 (N.D.Ill.), modified, 369 F.2d 230 (7th Cir. 1966); Michigan Magnetics, Inc. v. Nortronics Co., 245 F.Supp. 401, 403 (D.Minn.1965); Application of Winslow, 365 F.2d 1017, 1020 (C.C.P.A. 1966).

I think the proper way to deal with the prior art under section 103 in this case is set forth in Application of Winslow. "We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him." Ibid.

Of course, the court is well aware that "the question of obviousness [must] be decided as of the time the invention was made." Walt Disney Prods. v. Fred A. Niles Communication Center, Inc., 369 F.2d 230, 234 (7th Cir. 1966). In addition, the court has made every effort to heed the following admonitions: "There is no doubt, as the plaintiff has reminded us, that the fact that the solution to a problem is simple, or appears so, when viewed in retrospect, does not mean the solution was obvious when it was made, and that courts must guard against the exercise of hindsight in assessing the obviousness of a given improvement in the art." Zegers v. Zegers, Inc., 365 F.2d 156, 159 (7th Cir.), cert. denied, 385 U. S. 948, 87 S.Ct. 320, 17 L.Ed.2d 226, (1966). "Since a patent results in the

creation of a limited monopoly, the standards of patentability are to be strictly observed. Graham v. John Deere Co. * * *" Genesco, Inc. v. Knapp Bros. Shoe Mfg. Corp., 152 U.S.P.Q. 793, 797 (N.D.Ill.1967).

This court agrees with Judge Tehan that the two most important pieces of relevant prior art are Burgess Patent No. 1,233,308, and Ronning Patent No. 1,556,-718. The Burgess patent was cited to the Patent Office; the Ronning patent was not. Judge Tehan aptly described these patents as follows:

"24. Burgess issued in 1917, at which time few farms were electrified and describes an unloader driven by an engine located outside of the silo. The unloader has a non-rotating frame, which can be raised or lowered in the silo, on which is mounted a rotatable disk or cutter carrying scrapers or blades which, during rotation, loosen the silage and carry it to a hopper located at the center of the silo. It includes a mechanical elevator—an endless bucket conveyor—operating in a trough from the hopper through a hole in the silo roof. The trough restrains the frame from rotation.

"27. Ronning, issued in 1925, discloses a pneumatic conveyor for filling silos consisting of a fan or blower enclosed in a casing with an inlet at the center. A duct leads from below the casing to this inlet and a pair of picker wheels are located beneath the lower end of the duct to agitate the silage to be picked up in the duct by the suction of the fan. A pipe or discharge duct leads from the fan casing into the top of the silo. The conveyor was designed to be moved manually in a wagon to load the silage therein into a silo."

Ronning Patent No. 1,556,718 is more pertinent than Rasor Patent No. 2,-148,501, which was cited to the Patent Office. Ronning deals with movement of silage specifically and shows the complete device. Rasor does not. The presumption of patentability normally attached to the issuance of a patent by the Patent Office

has been severely weakened or does not apply at all as against the Ronning patent. See pp. 786 supra.

We note that the Patent Office had difficulty in concluding that the Leach device was patentable, because it was seen for some time as merely a combination of the Burgess gathering means with commonly understood suction means to convey the silage out of the silo. See Defendant's Exhibit 232, pp. 31, 47, 54. In light of this difficulty, it is significant that the Ronning patent never came to the attention of the patent examiner. While there is no evidence that the applicants for the patent in suit were aware of the Ronning patent prior to December 25, 1951, or should have cited this prior art reference to the patent examiner, the Ronning patent does disclose a suction device which could more easily be adapted to a silo unloader and combined with the Burgess device than the suction devices disclosed by Rasor Patent No. 2,148,501, Morrow Patent No. 1,971,425, or Foster Patent No. 1,550,311. A highly pertinent reference on a point which bothered the patent examiner was not before him.

The evidence presented to this court amply justifies Judge Tehan's statements at paragraphs 28 and 29, and this court adopts them.

"28. Burgess discloses a silo unloader having a vertically movable frame, means for restraining the frame against free rotation, means for lowering the frame in the silo, a cutter or cutter arm journaled in the frame for rotation or for rotation relative to the frame in a substantially horizontal plane (being the disk) and blades or blade means or cutting means on the disk for loosening silage and working it toward the center of the silo, which elements are all of the elements in the frame and gathering means described in the claim in issue except the agitators. Ronning discloses a pick-up duct or air duct, silage conditioning means or agitators beneath that duct for agitating silage to facilitate its becoming airborne or for directing silage into the duct and suction means as-

sociated with the duct for causing the silage to be picked up therein or means associated with the duct for creating an upward flow of air therein of sufficient intensity to cause the loosened silage to be picked up therein which elements describe the agitators and most of the essential elements of the pick-up and discharge means of the claims in issue. Thus, Burgess and Ronning disclose both the gathering means for moving silage to a pick-up means and a pick-up means comprising a fan with a suction inlet associated with an agitator, and those elements perform the same function in Burgess and Ronning as in the silo unloader of the plaintiff's patent. It is immaterial that Ronning's pick-up means is employed to load rather than unload a silo. The idea of employing the pick-up means of Ronning with the gathering means of Burgess, we find, was obvious to one skilled in the art and negatives invention in the combination called for in the claims in issue.

"29. Admittedly, the combining of the Burgess and Ronning devices would require alterations in both. [Walt Disney Prods. v. Fred A. Niles Communication Center, Inc., 253 F.Supp. 1, 6, 149 U.S.P.Q. 328, 332 (N.D.Ill.), modified, 369 F.2d 230, 151 U.S.P.Q. 528, (7th Cir. 1966): 'It is no overstatement to say that it is physically impossible to apply the prior art directly.'] In our opinion, these minor alterations do not render the combination unfeasible or involve substantial reconstruction beyond the skill of one skilled in the art."

This court agrees with the analysis which appears in Koehring Co. v. E. D. Etnyre & Co., 254 F.Supp. 334, 360–361 (N.D.Ill.1966):

"Claims 4 and 6 of the patent in suit do no more than define a combination of old well-known elements. The combination does not exceed the sum of its parts, no additional or unexpected function resulting. * * *

"The subject matter of a claimed invention may be unpatentable over the prior art notwithstanding the fact that all elements of any claim are not combined in one particular prior art reference and notwithstanding the fact that no one prior patent or publication teaches the exact specific form of device disclosed in the claim, if the alleged improvement is taught by the prior art taken as a whole. * * *

"The subject matter of a claimed invention may be obvious and unpatentable over the prior art notwithstanding the fact that the combination of prior art references does not precisely duplicate the patented article. It is sufficient that the combination described in the patent is obvious from the disclosures of the prior art. * * *

"A person skilled in the art would, in view of the prior art as introduced in evidence in this proceeding, be able to design the improvement claimed in Claims 4 and 6 of the patent in suit."

The conclusion that the patent in suit does not satisfy the nonobviousness requirement of 35 U.S.C. § 103 applies to all the claims involved in this action. As to claim 8, it appears that the most pertinent prior art was cited to the patent examiner, and as to that claim a presumption of patentability applies. However, this court concludes that the Burgess patent contains all the essential elements of claim 8 and therefore claim 8 should not have been allowed.

Plaintiff has argued that the following factors indicate that the Leach machine is a patentable device: (1) the immediate and substantial commercial success of the machine; (2) the fact that the machine satisfied a long-felt but unsolved need; (3) the failure of others to devise a commercially feasible silo unloader; and (4) imitation of the Leach machine by its competitors, including this defendant. Since the court concludes that the claims of the patent in suit are clearly invalid for the reasons heretofore stated, it does not find it necessary to discuss

these four secondary indicia of patentability.

"Judge Duffy speaking for the Court in H. W. Gossard Co. v. J. C. Penney Co., 7 Cir., 1962, 304 F.2d 515, 517–518:

'This Court stated in Hueter v. Compco Corp., 7 Cir., 179 F.2d 416, at p. 418: "In a close case evidence of the commercial success may tip the scales in determining whether an improvement amounts to an invention."

'However, it is just as well established that commercial success without invention will not make patentability. [citing cases.] "Although commercial success may be relevant in a doubtful case of patentability, it may not be used to create a doubt on the question where none would otherwise exist." Application of Jones, [49] Cust. & Pat.App. [893], 298 F.2d 944, 946.' "

Kennatrack Corp. v. Stanley Works, 314 F.2d 164, 168 (7th Cir. 1963). Bentley v. Sunset House Distrib. Corp., 359 F.2d 140, 145 (9th Cir. 1966): "When the combination is as clearly non-patentable as this one is, other factors on which Bentley relies cannot make it patentable. These are commercial success, which is not impressive in this case, copying, and claimed satisfaction of a long-felt need." Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950): "The Court of Appeals and the respondent both lean heavily on evidence that this device filled a long-felt want and has enjoyed commercial success. But commercial success without invention will not make patentability." Burgess Vibrocrafters, Inc. v. Atkins Indus., Inc., 204 F.2d 311, 314 (7th Cir. 1953): " 'Where, as here, however, invention is plainly lacking, commercial success cannot fill the void.' Jungersen v. Ostby & Barton Co., 335 U. S. 560, 567, 69 S.Ct. 269, 272, 93 L.Ed. 235. This court has several times stated that popular appeal alone is not sufficient to sustain a patent, and cannot be used to create a doubt where clearly there has

been no invention." See Corn Prods. Co. v. Standard Brands, Inc., 359 F.2d 739, 744–745 (7th Cir. 1966); La Maur, Inc. v. DeMert & Dougherty, Inc., 265 F.Supp. 961, 979 (N.D.Ill.1965), aff'd, 152 U.S. P.Q. 163 (7th Cir. 1966); Walt Disney Prods. v. Fred A. Niles Communication Center, Inc., 253 F.Supp. 1, 7 (N.D.Ill.), modified, 369 F.2d 230 (7th Cir. 1966); Howe v. General Motors Corp., 252 F. Supp. 924, 938 (N.D.Ill.1966).

This court has not been unaware of these four factors, however, and has considered them in the following sense: "While commercial success and the filling of a long felt want do not determine patentability, they do serve to guard against what the United States Supreme Court has called the 'temptation to read into the prior art the teachings of the invention in issue.' Graham v. John Deere, [383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545] * * *." Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F.2d 336, 337, (7th Cir. 1966).

Plaintiff's contention that the Volumatic and modified Volumatic silo unloaders infringe various claims of the patent in suit must be denied. "An invalid patent cannot be infringed." Pambello v. Hamilton Cosco, Inc., 377 F.2d 445, 660 (7th Cir. 1967); Kell-Dot Indus., Inc. v. Graves, 361 F.2d 25, 28 (8th Cir.), cert. denied, 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75 (1966); New Prods. Corp. v. Outboard, Marine & Mfg. Co., 263 F.2d 521, 525 (7th Cir.), cert. denied, 359 U.S. 1012, 79 S.Ct. 1149, 3 L.Ed.2d 1036 (1959); Hyster Co. v. Hunt Foods, Inc., 263 F.2d 130, 134 (7th Cir. 1959); Diversey Corp. v. Charles Pfizer & Co., 255 F.2d 60, 62 (7th Cir.), petition for cert. dismissed, 358 U.S. 876, 79 S.Ct. 116, 3 L. Ed.2d 106 (1958). Cf. 35 U.S.C. § 288:

"Whenever, without deceptive intention, a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid. The patentee shall recover no costs unless a disclaimer of the invalid claim has been entered at the Patent Office before the commencement of the suit."

The remainder of this opinion and order shall discuss the infringement issues in this case as if the claims of the patent in suit were valid.

On December 20, 1952, the James Manufacturing Company purchased the Leach silo unloader business and the right to manufacture and sell the device described by the patent in suit. James Manufacturing Company cancelled the contract with the Leach Company effective July 22, 1959, and infringement is claimed for the period following that date. See Transcript of Trial, pp. 922–25, 927–33; Plaintiff's Exhibits 45, 46, 51.

During the years when the James Manufacturing Company was selling the Leach machine, it also developed a new machine which it thought to be a substantial improvement over the Leach device. This new machine was known as the Jamesway Volumatic silo unloader. It first appeared on the market in June 1957. See Transcript of Trial, pp. 494–95, 763–68, 778–83.

The Volumatic silo unloader has an auger which is mounted for rotation below a cutter arm. This cutter arm is disposed along a diameter of the silo. The auger rests in a horizontal position and is slightly longer than the radius of the silo. See Transcript of Trial, p. 591. The auger is positioned so that one end will always be close to the inside wall of the silo, while the remainder of the auger extends radially to a point just past the geometric center of the silo. At the outer end of the cutter arm are two rubber wheels which ride along the inside wall of the silo and prevent the end of the auger from cutting into the silo wall. At the opposite end of the cutter arm some models of the Volumatic unloader have a spring-loaded arm with a rubber wheel on its end which constantly engages the wall of the silo. This spring exerts sufficient pressure upon the cutter arm to insure that the far end of the auger will always remain close to the silo wall. There is an additional metal arm fastened to the cutter arm at an angle of 90 degrees to it. A wheel at the end of this arm engages the silo wall. The purpose of this auxiliary arm is to limit the possibility of the machine swaying.

Mounted on top of the cutter arm about two feet radially beyond the end of the auger nearest the center of the silo is an electric motor. This motor is connected to the end of the auger shaft by means of belts and pulleys. Operation of the motor causes the auger shaft to rotate rapidly. Since the device is designed to rest directly on top of the silage, rotation of the auger will cause silage to be loosened and brought to the center area of the silo by the auger flighting. Before silage can be so conveyed, a certain amount of silage must accumulate in front of the rotating auger. This sideboard of silage provides sufficient resistance so that the auger flighting can cut a trough in the silage and can convey silage.

Fastened to the auger shaft beyond the inner end of the auger flighting is a small square metal plate. This plate rotates with the auger shaft and tends to prevent the silage which is being delivered by the auger from passing beyond this plate. Between the plate and the end of the auger flighting is a metal finger, or kicker, or agitator, fastened perpendicularly to the auger shaft. This piece of metal, rotating with the auger, kicks upward the silage which has been brought in by the auger. The amount of silage so kicked and the height to which it is impelled appears to vary with the density of the mass of silage being accumulated in the area.

Directly above the auger shaft and directly behind the square metal plate is a vertical centrifugal fan or blower. The shaft of this fan is parallel to the auger shaft and is rotated by the motor. This high speed fan is enclosed in a circular casing with a solid back. There is an opening in the side of the fan casing which faces the auger. This opening reveals the eye of the fan and an area below the eye. This opening is shielded by a slanted hood which is fastened to the cutter arm. The bottom of this hood is open,

this open area being a rectangular horizontal plane measuring eight by thirteen inches. The opening in the fan casing extends below the level of this base of the hood.

As silage is delivered by the rotating auger, it is prevented from proceeding past the square plate on the auger shaft. Rather it accumulates in an area directly below the opening or bottom plane of the slanted hood. This silage is forced upward by the kicker and by the end of the auger flighting and by the force of additional silage which is constantly being brought in by the auger. See Transcript of Trial, p. 390, Professor Flikke: "[T]he first silage that comes into this opening is tossed upward either by the auger itself or the combined action of the agitators * * *." The rotating fan produces an air flow which draws the silage laterally into the fan. There is a substantial flow of air in the hood and the area beneath it. This air moves the silage particles laterally into the fan itself and assists the upward movement of the silage into the area of the hood.

Silage which enters the fan casing is thrown or blown out tagentially through an opening in the top of the circular fan casing. It does not appear clear whether the silage must be given motion by being hit by the rotating fan blades or whether a sufficient air flow is developed to carry silage particles with it. Probably both forces combine to move the silage. Attached to the opening in the top of the fan casing is a long curved duct which directs the rapidly moving silage upward and sideways out of the silo through the opening in the side wall of the silo. The silage then falls into a conveyance below.

The bottom portion of this discharge duct system is journaled so that it can rotate in the center of the frame which supports the entire machine. This frame consists of three radially disposed beams which come together so that the last approximately three feet of each beam form one side of an equilateral triangle. The upper portion of the discharge duct system is fastened within this triangle, and the lower portion is journaled within this fixed upper portion.

At the ends of each of the three arms of this frame are fastened cables which extend upward to the center of the silo, where they are combined into a single cable. This cable extends out of the silo and down to a winch at ground level. By operating this winch the silo unloader can be raised or lowered in the silo.

Suspended near the ends of each of the three arms of the supporting frame are short, pivotable links of metal. Attached to these links is a large, narrow, perforated, metal ring which has a radius of about five feet. Engaging with the perforations in this ring is a gear which is attached, together with a speed reduction gearing mechanism, to the top of the cutter arm at a point near its outermost end. Attached to this gearing mechanism is a drive shaft which is connected to the electric motor by means of a belt and pulley. When the motor operates, the gear which engages the perforated ring rotates and causes the entire cutter arm to "walk" around the top surface of the silage in the silo. The electric motor, the auger, and the fan and its casing all are attached to the cutter arm and revolve with it. Thus the auger can cut a uniform layer of silage off the top surface of the silage in the silo.

In October 1962 the James Manufacturing Company placed its modified Volumatic silo unloader on sale. In this machine the slanted hood which shields the opening in the side of the fan casing has been replaced by a curved, open-ended piece of metal. The shaft of the fan has been extended, and upon this shaft is a short auger. This auger rotates with the fan and directly conveys into the fan housing the silage which reaches the level of the bottom of the auxiliary auger's flighting.

" '[T]he test of infringement is whether the accused device does the same work in substantially the same way and accomplishes the same result.' " Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100, 109 (7th Cir. 1957), cert. denied, 356

U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958). See Walt Disney Prods. v. Fred A. Niles Communication Center, Inc., 253 F.Supp. 1, 11 (N.D.Ill.), modified, 369 F. 2d 230 (7th Cir. 1966). "[T]o infringe there must be real identity of means, operation and result * * *." Howe v. General Motors Corp., 252 F.Supp. 924, 936, 149 U.S.P.Q. 808, 818 (N.D.Ill.1966).

Claims 2 and 20 contain as an element "means * * * for creating an upward flow of air therein of sufficient intensity to cause the loosened silage to be sucked up into the duct * * *." Claim 6 contains as an element "suction means associated with the duct for causing the loosened silage to be picked up in the duct * * *." Claim 12, and by reference Claims 15 and 16, contains as an element "means associated with the duct for creating an upward flow of air therein of sufficient intensity to cause the loosened silage to be sucked up into the duct * *." Claim 17 contains as an element "suction means associated with the duct for causing the loosened and agitated silage to be picked up in the duct * * *." Thus all the claims in suit except Claims 8 and 11 require an air flow of sufficient intensity to pick up silage. Most of the tests and much of the testimony in this case has been directed to the question of whether under normal operating conditions the James machines produce a flow of air sufficient to pick up silage. The intensity of air flow needed to raise, or lift up, or suck up, a particle of silage is known as the floating velocity of that particle.

The parties appear to be in substantial agreement that the proper or crucial area where the intensity of air flow should be measured on the James machines is at the horizontal plane of the inlet hood. Transcript of Trial, pp. 469–72, 792–99, 887–88, 900–03.

It was at this point that Mr. Melvin Meyer of Bayley Blower Company made measurements of the air velocities of the James machines. He also computed the floating velocities of various types of silage particles. He concluded that the floating velocity of the heaviest particle of silage is 2,605 feet per minute. Plain-

tiff apparently does not argue with these computations. Plaintiff's Exhibit 67, paragraph 27. Mr. Meyer determined that the maximum air velocity at the plane of the hood of the Volumatic machine was 1,900 feet per minute and of the modified Volumatic machine was 1,450 feet per minute. Defendant's Exhibits 240, 241. Plaintiff's expert, Professor Flikke, testified, Transcript of Trial, p. 369:

"Q Is it your contention, Professor, that the inlet velocities at the bottom of the hood in the accused device exceed 2,605 feet per minute?

A No, they do not.

Q What do they measure?

A Oh, in the neighborhood of somewheres around 1,500.

Q What do you base that on?

A Velometer and ammeter measurements.

Q Is that the average measurement across the bottom of the hood?

A I would have to check but I think that is a fairly decent figure."

This court is unable to escape the conclusion that the James machines do not produce air velocities sufficient to pick up, or lift up, or suck up, silage.

Rather than trying to refute Mr. Meyer's tests directly, plaintiff relies on tests performed with the Volumatic machine. These tests consisted of placing a wire spatula or paddle with a small heap of silage on it in the area in front of the opening in the fan casing. During the tests the fan was run at normal operating speed and the gathering auger was disconnected. During the tests the silage moved rapidly off the spatula and into the fan. The trajectories of the particles of silage varied, but it appeared that some particles moved upward, as well as laterally, into the fan. The best evidence of these tests is three motion pictures, Plaintiff's Exhibits 23, 32, 73. The court studied these movies during the trial and has reviewed the testimony concerning them. See Transcript of Trial, pp. 161–63, 216–18, 360–66, 427–32, 459–61, 866–

78, 980–84. The court finds that it is unable to determine exactly the position of the spatula when particles of silage left it in an upward trajectory. The angle at which the motion pictures were taken coupled with an absence of clear reference points in the pictures make it impossible to determine whether silage particles of greatest density, such as pieces of cob and kernels, moved upward before the particles had reached the horizontal plane of the inlet hood. Thus the court concludes that the paddle tests do not refute Mr. Meyer's findings.

Plaintiff's only other attempt to explain where Mr. Meyer's tests are faulty appears at pages 377–78 of the Transcript of Trial:

"Q [by Mr. House] You mean to tell me that you can stand—sit here on that stand and tell me that you put that paddle down below the hood, and it took off the silage?

A [by Prof. Flikke] As I bring the paddle into the vicinity of the inlet to the hood, the silage is swept off.

Q Now, we can tell that from the motion pictures, can't we?

A Yes.

Q And if that happened, which I don't think it did, how do you reconcile that with these velometer readings that show that the velocity is less than that required to lift the silage?

A I really don't know a good answer to that, sir. I've tried to figure it out in relationship to these calculated velocities and the observed action within the hood.

The only conclusion is that the peculiarities of this type fan is such that it funnels the air. And once the silage gets into it, it still has the capability of moving the silage."

There was no further discussion or explanation of what Professor Flikke meant when he suggested that the fan "funnels the air." The court concludes that this brief explanation does not refute Mr. Meyer's findings.

Furthermore, defendant conducted tests with an extension on the inlet hood of the Volumatic machine. Since in these tests the machine was unable to deliver heavier silage particles, these tests support the contention that the Volumatic machine cannot pick up or suck up silage. See Transcript of Trial, pp. 365–66:

"Q [by Mr. House] Now, let us compare your spatula tests, Professor, with the Defendant's Lake Mills' test. You recall in that test the Defendant raised the impeller twelve inches above the level which it previously occupied and put an extension hood down from the bottom of the regular hood in order to eliminate the auger-feeding function; do you recall that?

A [by Prof. Flikke] Yes.

Q Now, in that test what was the force that lifted whatever components of the silage were picked up into the regular hood on top of the extension hood?

A Suction.

Q Right. In your spatula test, what force lifted the silage up into the hood?

A My placing it there on the paddle.

Q That's right. Now—so in the Lake Mills' test, the air had to do the lifting job, right?

A Yes.

Q And in your spatula test, the air didn't have to do the lifting job, isn't that right?

A If you define it at a level, yes.

Q I am talking about getting it up into the hood.

A Yes, then you are right."

See Transcript of Trial, pp. 700–02.

The fact that there is an upward flow of air in the James machine does not mean that the James machine infringes the Leach patent. The claims of the patent require an air flow which can pick up or suck up particles of silage A ma-

chine which uses an air flow to assist the movement of particles which have been picked up or thrown up by other means does not constitute an infringement where the upward flow of air is not sufficient to lift up silage by itself.

Plaintiff conducted tests of the James machine with an opening in the back of the fan casing. See Transcript of Trial, pp. 183–202, 227, 267–73, 327–34, 337–42, 350–53. In these tests the James machine jammed and refused to deliver silage. These tests indicate that the James machine depends upon suction for its operation. But the court does not think that this means there has been an infringement of the patent in suit. The suction required by the claims of the patent is an upward suction. In the jams which were the result of the operation with an opening in the back of the fan, there was no lack of silage which had been conveyed up into the hood. Indeed, the hood was packed tight with silage, even at the top. What was apparently missing was a force sufficient to move the silage laterally into the fan. In the normal operation of the James machine, this force is a flow of air into the fan. This flow of air is sufficient to convey the silage laterally into the fan. Professor Flikke testified that he thought an air flow of about twenty percent of their floating velocity would be sufficient to convey silage particles laterally. Transcript of Trial, pp. 381–82. The court concludes that the James machine does require a flow of air, far less in amount than that needed to lift silage particles vertically, in order to move silage particles laterally into the fan from the area in front of the fan and under the hood, to which they have been delivered by the auger and kicker. The fact that the James machine requires suction to move silage laterally does not indicate that the claims of the patent in suit are infringed.

Defendant attempted to prove that neither of its machines requires *any* suction or air flow for its operation. Tests of the accused devices were made in a vacuum chamber at AC Electronics. See Defendant's Exhibits 248, 250. The accused devices were able to unload substantial amounts of silage while operating in a ninety-five percent vacuum. However the court is not convinced that the Volumatic silo unloader could operate without the presence of any air; the open back tests indicated that a flow of air is probably necessary to move silage laterally into the fan. While not wholly convincing, the presence of five percent of the normal amount of air during the vacuum chamber tests seems to explain the apparent conflict between the results of the vacuum chamber test and the open back test. In any case, the court does not find it necessary definitively to resolve this apparent conflict. It is enough to conclude, as the court has concluded, that the air flow necessary to the functioning of the James machine is less than that required to lift silage vertically.

Claim 8 of the patent in suit contains as an element "a vertically movable spider-like frame having a center portion and three horizontally radiating arms, which arms are adapted to engage with the sides of the silo to center the frame within the silo * * *." The court fails to find such a frame in the Volumatic machine. The three-armed frame of the Volumatic machine does not engage the sides of the silo.

If extensions with devices of some type to engage the sides of the silo were to be put on the three arms of the James machine, then these devices would require a substantial amount of give or leeway. Professor Flikke suggested that one could use springs at the ends of the arms, much as at the end of the cutter arm farthest from the auger. Transcript of Trial, pp. 970–72. However, if such a spring device were used, centering the frame would not be the function of the device which would engage with the side of the silo. The center of the frame of the James machine is the center of the equilateral triangle formed by the three intersecting beams. This point corresponds with the center of the lower portion of the discharge duct. Since this part of the discharge duct is as wide as the fan casing, we see that the center of the frame is

always over the center of the fan. One half the width of the fan casing is two and one half inches. The distance between the end of the auger flighting and the side of the fan casing is about three to four inches. The auger flighting is slightly longer than the inside radius of the silo. The center of the frame in the James machine can never be closer to the center of the silo than six or seven inches. Thus as the cutter arm rotates in the silo, the center of the frame moves in a circle with about a six inch radius from the center of the silo. See Transcript of Trial, pp. 587–98, 858–64.

It is true that a variation of six or seven inches from the true center of a silo is relatively small as compared with silos having radii of eight to fifteen feet. However there are two reasons why it is a sufficient variation to avoid infringement. First, the fact that the center of the James machine's frame does not draw closer than six inches from the center of the silo is not incidental or accidental. This variation is essential to its operation. The auger was purposely designed to be longer than the radius of the silo so that, during the course of a single revolution around the silo, it would cut the entire top surface of the silage. If the center of the frame were to coincide with the center of the silo, nothing would cut loose the silage immediately below the fan housing. The entire machine would get hung up on a core of uncut silage and cease to unload silage. Transcript of Trial, pp. 587–98. On the other hand, it is just as essential to the proper operation of the Leach machine that the center of its frame be the center of the silo. A slight variation from center in the Leach machine would cause both the outermost blade and the cutter arm to strike the wall of the silo at one point on each revolution, and would leave an area of uncut silage on the opposite side of the silo. Transcript of Trial, pp. 583–86.

There is a second reason for holding that when Claim 8 refers to centering the frame, the claim means the geometric center of the silo and excludes a variation of as much as six inches. A more liberal

reading of the words of the claim to mean that the frame should rest at substantially the center of the silo would do violence to the patent. The claims of the patent have been carefully written and rewritten at the insistence of the Patent Office. See Defendant's Exhibit 232. Where the inventor meant "substantially the center of the silo," he used those very words. Claim 17 contains the language, "a pickup duct leading upwardly from the cutter arm at substantially the center of the silo * * *." Claim 20 contains the language, "an arm journaled in the frame at substantially the center of the silo * * *" and "an air duct having an unobstructed vertical inlet portion mounted on the frame at substantially the center of the same * * *." To interpret the word "center" to mean "substantially the center" in all of the claims would require the conclusion that the word "substantially" is superfluous in Claims 17 and 20. This court will not rewrite the claims of a patent, by either addition or subtraction.

For the reasons expressed above, the court concludes that there has been no infringement of Claim 8 of the patent in suit. For the same reasons it follows that Claims 2, 6, 12, 15, 16, and 17 of the patent in suit have not been infringed since the cutter arm of the Volumatic machine is not journaled in the frame at the center of the silo, as required by those claims.

Claim 11 contains as an element "a relatively short suction duct at the pivotal connection of the arm with the support * * *." The court finds that in the Volumatic silo unloader, only the discharge duct is "at the pivotal connection of the arm with the support."

Plaintiff claims that the slanted hood on the Volumatic device is a suction duct and that the fact that it is located elsewhere than at the pivotal connection of the arm with the support does not prevent infringement, according to the doctrine of transposition of parts. "Changing the relative positions or reversal of the parts of a machine or manufacture does not avert infringement, where the parts transposed perform the same re-

spective functions after the change as before." 3 Deller, Walker on Patents § 463 (3d ed. 1937). The court concludes that this doctrine is not applicable in the present case because the hood in the accused device performs a different function than the suction duct in the patent in suit. The Leach suction duct is the channel through which suction lifts the silage upward. The hood on the Volumatic machine also assists the flow of silage into the fan, but in the accused device suction is needed only to give the silage a lateral motion. The silage is brought into the hood by means other than suction. Thus even if we consider the hood on the accused device a suction duct, its function is different from that of the suction duct of Claim 11 and therefore the doctrine of transposition of parts does not apply.

We have already noted that it was difficult for plaintiff to obtain the patent in suit. Claim 11 was accepted only after three rejections of similar or related claims. In light of the care which obviously went into drafting Claim 11, this court does not think it proper now to rewrite this claim, in effect, by striking as superfluous the words "at the pivotal connection of the arm with the support." "We deal with the patent as issued, not as it might have been issued." Keating v. Stearnes Imperial Co., 347 F.2d 444, 447 (7th Cir. 1965). See also Charles Peckat Mfg. Co. v. Jacobs, 178 F.2d 794, 798 (7th Cir. 1949), cert. denied, 339 U.S. 915, 70 S.Ct. 575, 94 L.Ed. 1340 (1950). The court concludes that the Volumatic silo unloader does not infringe Claim 11.

Claim 11 contains as an element "an electric motor anchored on the support for vertical movement with the latter * * *." In the accused device the electric motor is anchored on the cutter arm, not on the supporting frame. Resting on the cutter arm, the motor rotates around the inside of the silo, necessitating a brush and slip ring assembly to supply power to the motor, as illustrated in Figure 11 of Seymour Patent No. 2,963,327, Plaintiff's Exhibit 34. The Volumatic motor tends to balance the weight of the auger. Again, to hold that the Volumatic silo unloader infringes Claim 11 of the patent in suit would be to rewrite the claim, omitting the words "anchored on the support for vertical movement with the latter."

Since this court finds that certain elements of each of the claims relied on by plaintiff are absent in the accused devices, it will not discuss those elements of the claims which do appear in one or both of the accused devices. Unless all of the elements of a claim appear in the accused device, there can be no infringement.

Thus far we have been discussing primarily the alleged infringement by the Volumatic machine. However all of the above findings and conclusions apply with equal or greater force to the modified Volumatic machine.

Since not all of the elements of any one of the claims in suit are present in either one of the James machines, the court holds that there has been no infringement of Leach Patent No. 2,580,306 by defendant. As stated earlier in this opinion and order, the court also concludes that Claims 2, 6, 8, 11, 12, 15, 16, 17, and 20 of the patent in suit are invalid.

It is therefore ordered that the Clerk enter judgment dismissing this action. The Clerk shall tax costs against the plaintiff pursuant to Rule 54 of the Federal Rules of Civil Procedure. This is not an exceptional case which justifies awarding attorneys fees pursuant to 35 U.S.C. § 285.